**WHITNEY BENEFITS, INC. and Peter Kiewit Sons' Co., Plaintiffs–Appellees,**

v.

**The UNITED STATES, Defendant–Appellant.**

No. 90–5058.

United States Court of Appeals, Federal Circuit.

Feb. 26, 1991.

Rehearing Denied April 2, 1991.

Suggestion for Rehearing In Banc Declined May 6, 1991.

George W. Miller, Hogan & Hartson, Washington, D.C., argued for plaintiffs-appellees. With him on the brief were Jonathan L. Abram and Charles J. Felker.

James S. Burling, Ronald A. Zumbrun, Robin L. Rivett and John M. Groen, Pacific Legal Foundation, Sacramento, Cal., were on the brief for amicus curiae, Pacific Legal Foundation.

John A. Bryson, Department of Justice, Washington, D.C., argued for defendant-appellant. With him on the brief were Richard B. Stewart, Asst. Atty. Gen., Environment & Natural Resources Div., Lisa Hemmer and Michael P. Healy, attorneys. Also on the brief were Steven Brown, John Jasper, Jacques B. Gelin and Alfred T. Ghiorzi, Office of the Solicitor, Department of the Interior, Washington, D.C., of counsel.

Before MARKEY, NEWMAN and CLEVENGER, Circuit Judges.

MARKEY, Circuit Judge.

Appeal from a judgment of the United States Claims Court (Smith, C.J.) that the United States (government) took a mineral estate (Whitney coal) from Whitney Benefits, Inc. and Peter Kiewit Sons' Co. (PKS) (collectively Benefits) upon enactment of the *Surface Mining Control and Reclamation Act of 1977*, 30 U.S.C. §§ 1201 *et seq.* (SMCRA), and requiring payment of $60,000,000, plus interest to Benefits.[1] We *affirm.*

## I. BACKGROUND

The facts are set forth in *Whitney Benefits v. U.S.*, 752 F.2d 1554 (Fed.Cir.1985) and in the comprehensive findings and conclusions accompanying the judgment appealed from. *Whitney Benefits v. U.S.*, 18 Cl.Ct. 394 (Cl.Ct.1989). All of the probative facts being thus readily available to a reader of this opinion, no useful purpose would be served by a mere recast in our own words of Chief Judge Smith's exhaustive exposition of the facts in his scholarly and well-reasoned opinion.

## II. ISSUES

A. Whether the Claims Court correctly concluded, based on not-clearly-erroneous findings, that on enactment SMCRA's prohibition of surface mining of alluvial valley floors (AVF's) constituted a taking of the Whitney coal property.

B. Whether the Claims Court's valuation of the coal property taken is clearly erroneous.

## III. DISCUSSION

### INTRODUCTION

A key element in this case is that SMCRA expressly precluded a permit for surface mining an AVF described in the statute in terms precisely applicable to, and known to be applicable to, the AVF overlying the Whitney coal property.

Contrary to the tone and tint of the government's arguments on this appeal, the constitutionality of SMCRA is not at risk here. Benefits accepts the untrammeled right of Congress to prohibit surface mining of its Whitney coal property. All

---

1. A brief urging affirmance was filed by Pacific Legal Foundation as *amicus curiae.*

Benefits seeks is the aid of the courts in forcing governmental compliance with the compensation clause of the Fifth Amendment to the Constitution. After an extended trial, the Claims Court found that Benefits had proved facts establishing its right to compensation and the amount thereof that would be just. The case is fact-specific and basically uncomplicated, dealing only with Benefits' property right to mine a single specific deposit of coal (Whitney coal) and the market value of that right. In attempting to shoulder the heavy appellate burden of establishing that the judgment appealed from rests on reversible error, the government proffers a plethora of attorney arguments and assertions, none of which finds adequate support in the evidence, all of which are treated and rejected in what follows.

## A. *Taking Upon Enactment in 1977*

On this issue the government argues that: (1) the standard of review is *de novo*; (2) no taking could occur until Benefits had applied for and been denied a mining permit; (3) SMCRA did not prohibit Benefits from mining the "Whitney coal"; (4) SMCRA did not deprive Benefits of all economic use of its property; and (5) the Claims Court failed to consider Congress' motivation.

### 1. *Standard of Review*

■ The government cites *Bowen v. Public Agencies Opposed To Social Secur-*

*ity Entrapment,* 477 U.S. 41, 51–55, 106 S.Ct. 2390, 2396–98, 91 L.Ed.2d 35 (1986), but *Bowen* dealt only with a legal issue and did not address the standard of review. This court reviews Claims Court judgments to determine whether they are "incorrect as a matter of law" or premised on "clearly erroneous" factual determinations. *Heisig v. United States,* 719 F.2d 1153, 1158 (Fed. Cir.1983).

Having asserted a right to review "de novo", the government then misconstrues the nature of such review and the posture of the case, arguing for the most part as though the Claims Court had not conducted a six-day trial and simply ignoring this court's direction in the earlier appeal that the Claims Court make findings on the factual questions it did.[2]

### 2. *Mining Permit*

■ Calling SMCRA a "regulatory statute", the government says it could not be deemed a taking until an expert agency applied its judgment and field reconnaissance to evaluate the surface of the land. The government does not suggest, and did not suggest at trial, any basis whatever on which a permit could be legally granted to surface mine Whitney coal. Indeed, SMCRA expressly provides that "no permit shall be approved" under conditions precisely descriptive of the Whitney coal estate.[3] The Government has not shown

---

**2.** In a surprising display of how to misread a court opinion, the government says the dissenting judge in *Whitney Benefits,* 752 F.2d at 1559–562, "conclud[ed] that enactment of SMCRA had not taken [Benefits'] property". As that dissent made plain, it was based on an apparent failure of the complaint to allege prohibition of all mining methods and suggested that Benefits might amend to allege inability to mine "by any means permitted under § 260". That the prohibited method, surface mining, is the only method of mining the Whitney coal deposit is now uncontested.

**3.** 30 U.S.C. § 1260(b) states:
(b) No permit ... shall be approved unless

· · · · ·

(5) the proposed surface coal mining operation, if located west of the one hundredth meridian west longitude, would—

(A) not interrupt, discontinue, or preclude farming on alluvial valley floors that are irrigated or naturally subirrigated, but, excluding undeveloped range lands which are not significant to farming on said alluvial valley floors and those lands as to which the regulatory authority finds that if the farming that will be interrupted, discontinued, or precluded is of such small acreage as to be of negligible impact on the farm's agricultural production.

clear error in the Claims Court's finding that any surface mining permit application would in this case have been futile. Indeed, the record is clear that any such application was obviously and absolutely foredoomed on the day SMCRA was enacted.[4]

The government's facile application of the label "regulatory" and its citation of cases dealing with congressional regulation of the uses of land and other property subject to many uses are inapt here. First, as the Claims Court correctly found, the *only* property here involved is the right to surface mine a particular deposit of coal. The only possible use of that right is to surface mine that coal. When Congress prohibited that mining of that coal, it did not merely regulate, it took, all the property involved in this case. Second, if SMCRA could somehow be deemed "regulatory" in this case, it would avail the government nothing, for a regulatory statute that "goes too far", will be recognized as a taking. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). Even if labeled "regulatory," the present statute "went too far" in relation to Whitney coal and its circumstances, when it prohibited surface mining and provided that "No permit ... shall be approved" under those circumstances. That a permit might be obtained to mine coal properties *other* than Whitney coal does not change the statute to one that merely seeks to "regulate" the mining of Whitney coal for which no permit could legally be obtained. Before SMCRA was enacted, Benefits had a property right it could expect to exercise, i.e., to surface mine the Whitney coal. The moment SMCRA was enacted, Benefits no longer had that property right, for it had no permit and could not possibly under the statute obtain one for a mine that would obvi-

ously violate the conditions expressly set forth in SMCRA. 30 U.S.C. § 1260.

We are, of course, fully aware of the cases favoring administrative action. Many are here cited by the government. But in those cases administrative action might have had an effect on whether there was a taking. This is not such a case. On the contrary, this case falls among those in which the Supreme Court has found no need to exhaust administrative remedies: *Weinberger v. Weisenfeld*, 420 U.S. 636, 641, 95 S.Ct. 1225, 1229–30, 43 L.Ed.2d 514 (1975) (no need to exhaust because statute "on its face precludes granting benefits to men"); *McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) (no need where facts clearly fit statutory definition). If there be coal properties to which SMCRA's permit provision might apply, Whitney coal is not and never was such a property. Hence, the Claims Court correctly held that "it would be unreasonable under the particular facts of this case to hold that a taking could not have occurred until a subsequent administrative determination was made that mining of Whitney coal was prohibited."[5]

### 3. *SMCRA Prohibited Mining Whitney Coal*

■ In 1985, this Court said a taking occurs "when economic development [is] effectually prevented." *Whitney Benefits*, 752 F.2d at 1559. On remand, the Claims Court carefully considered and discussed every factual and legal argument the government presented and found as a fact that in 1977 SMCRA clearly prohibited surface mining of Benefits' coal, thereby depriving Benefits of "all economically viable use" of its property and destroying its value. That finding is not only correct and fully supported by the evidence, it is entitled to respect and may be upset only if it

---

4. The government makes much of a permit application filed by Benefits in 1978, but disregards a major fact: Benefits was directed to file that application as part of its effort to obtain a coal exchange. The Claims Court correctly found that Benefits never sought a permit to mine their coal after SMCRA's enactment. The government's use of a "permit process" as inter-

changeable with "exchange process" is inappropriate.

5. The Claims Court noted and treated the government's assertions that: (1) Benefits must have first sought a permit, 18 Cl.Ct. at 407; *and* (2) Benefits could not have obtained a permit, 18 Cl.Ct. at 403.

is shown to have been clearly erroneous. *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 889 (Fed.Cir.1983). The government has made no such showing, but, as in *Skaw v. United States,* 740 F.2d 932 (Fed.Cir.1984) and *Drakes Bay Land Co. v. United States,* 424 F.2d 574, 586 (Ct.Cl.1970), has on appeal carried its attempt to deny the impact of SMCRA on Whitney coal to unreasonable lengths in an apparent hope of postponing the day of reckoning into eternity. In this case, it has taken that tactic too far.

First, immediately before trial, the government stated in a Federal Register statement by BLM that "[d]evelopment of the [Whitney] coal was halted by the passage of [SMCRA]." 51 Fed.Reg. 3124, 3125 (January 23, 1986). Having made that concession, the government offered absolutely no evidence at trial to counter that official statement. Nor did it present a single witness to testify that there was any uncertainty whatever about SMCRA's taking effect on Benefits' coal property in 1977.

Second, Benefits proved that SMCRA's AVF prohibition applied to the property because of obvious physical facts about the property. The AVF overlying most of the Whitney coal was described as plain to the eye, and farming and ranching had long operated on the surface above the Whitney coal. At trial the government stipulated the foregoing facts about the property. As the Federal Register statement reflected, the government knew SMCRA applied on enactment to Whitney coal. Benefits knew SMCRA applied; and any prospective buyer would know it applied.

Thus, the facts proven in this case are even more probative of a taking than those in *Skaw.* There, owners of mineral interests under Idaho's St. Joe River alleged that their property was taken by a statute that destroyed mining rights under the St. Joe. As this Court recognized in the prior appeal of this case, it was held in *Skaw,* 740 F.2d at 938–40, that the plaintiffs would show a legislative taking if they "could try on the shoe and it fit"—i.e., by proving at trial that their interests lay within the boundaries of the prohibition and that they could not be mined by methods other than surface methods. As ·the Claims Court fully elucidated, that is just what Benefits proved here.

Third, SMCRA's legislative history confirmed the presence of a legislative taking of the Whitney coal property. Congress was carefully attentive to the question of which particular coal properties it was affecting.[6] In considering the scope of the AVF prohibition itself, and the effect of "grandfathering" mines already operating and those with *de minimis* AVF involvement, Wyoming's Representative Roncalio warned that grandfathering AVF mines that had made "substantial legal and financial commitments," but that had not yet actually received a permit to mine, presented the "strong possibility" that the "Whitney Benefits mines on the Tongue River in Sheridan County in Northern Wyoming" would be grandfathered. 123 Cong.Rec. 12638–9 (1977). He urged that the bill be revised—as it eventually was—to ensure against even the possibility that the Whitney property would escape the AVF prohibition. The government's attack on this

---

**6.** *See, e.g., ICF, Inc. Study Inquiry: Hearing on the Report by ICF, Inc., on the Energy and Economic Impacts of the Surface Mining Control & Reclamation Act of 1976 Before the Subcomm. on Public Lands & Resources of the Senate Comm. on Energy & Natural Resources,* 95th Cong., 1st Sess. 45 (1977) (as part of the ICF, Inc. Study, the E.P.A. conducted aerial flyovers of "virtually all" of the 70 to 100 proposed western mining sites known to the Bureau of Mines); *Surface Mining Control & Reclamation Act of 1977: Hearings Before the Subcomm. on Energy & the Environment of the House Comm. on Interior & Insular Affairs,* 95th Cong., 1st Sess., Part II, 219–236 (1977) (Subcommittee viewed slides of AVFs in Wyoming and Montana and reviewed list of proposed surface mines in four states including Wyoming that might be affected by the AVF provisions of SMCRA); *Id., Pat III,* 57–61, 400, 405–407 (representatives of companies with existing and proposed mines in Wyoming testified about SMCRA's grandfather clause); *Surface Mining Control & Reclamation Act of 1977: Hearings on S. 7 Before the Subcomm. on Public Lands & Resources of the Senate Comm. on Energy & Natural Resources,* 95th Cong., 1st Sess., 839, 842–43 (1977) (owner of surface land overlying Whitney coal effectively asked Congress not to grandfather Whitney coal).

legislative history simply ignores what Congress *did.* Congress revised the bill to insure that SMCRA itself *would* preclude the mining of Whitney coal.

Still, the government insists that uncertainty remained about SMCRA's prohibition against mining the Whitney coal, citing Rep. Roncalio's explanation of how the grandfather clause "might affect" certain mines. But the phrase related to "financial and legal commitments",[7] not to the prohibition of mining. Indeed, Rep. Roncalio went on to recommend an amendment that would make clear that the grandfather clause would *not* apply to Whitney. 123 Cong.Rec. 12,638–39 (1977). There never was any doubt that adoption of his amendment would insure that the AVF prohibition would apply with full force to the Whitney coal property. The government's effort here to construct such a doubt is insupportable.

Oddly, while saying reliance on Rep. Roncalio's actions is inappropriate, the government itself relies on a list offered by him. The list identified 13 mines on which AVFs represented only 0% to 3.7% of the mine area. Again, the government's reliance is inapt, for the list covered only mines with "federal involvement"—those including federally leased coal—and by definition excluded fee coal like Whitney. Moreover, the small areas of AVF overlying the listed mines actually dramatize the taking effect of SMCRA on Benefits, whose entire coal property was either covered by an AVF or rendered unmineable by it.

The government's argument that SMCRA did not prohibit mining Whitney coal is simply untenable. The facts correctly found by the Claims Court on Benefit's investment and on "the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the governmental action," *Whitney Benefits,* 752 F.2d at 1558, establish that SMCRA on enactment effected a taking of Benefits' Whitney coal estate.

### 4. *SMCRA Deprived Benefits of All Economic Use*

▮ On this issue, the government continues to cite language in cases in which a statute regulated but one or a few of numerous uses to which the involved properties might be put. As above indicated, the property here involved, Whitney coal, has only one use and that use is prohibited by SMCRA. In a strained effort to construct some other "economic use" or "economic benefit" remaining after enactment of SMCRA, the government says: (a) Benefits could farm some land, and (b) the coal exchange preserved the economic value of Whitney coal. Neither assertion finds a basis in the record or in law in this case, and neither renders clearly erroneous the Claims Court's finding that the "diminution in value [of Whitney coal] was total."

#### a. *Farming*

PKS bought a parcel of a little less than 600 of the 1327 acres overlying Whitney coal. Continuing to disregard inconvenient findings, the government ignores the Claims Court's finding that the purchase was to facilitate PKS' intended mining of the Whitney coal beneath the parcel and then goes on to speculate, without reference to the record, that PKS might have been able to farm that parcel. On that speculative premise, the government says SMCRA did not deprive Benefits of all economic value. The purchase of the parcel to facilitate mining was clearly a part of the investment backing for Benefits' expectations, not unlike a purchase of mining equipment. We fully agree with the Claims Court's evaluation of the argument as "completely off the mark". SMCRA took Benefits' *coal rights.* That is what, and only what, this suit is all about. As the Claims Court noted, Wyoming recognizes separate mineral and surface estates, *Williams v. Watt,* 668 P.2d 620, 624–25 (Wyo.1983) and mineral rights are clearly property subject to the taking clause of the Fifth Amendment. *Skaw,* 740 F.2d at 935–36.

7. Benefits proved a pre-SMCRA investment of well over a million dollars. 18 Cl.Ct. at 397.

Labeling Benefits' demand for compensation as a "facial" challenge to SMCRA, the government relies extensively on *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). But the demand for just compensation here is clearly distinct from the merely argumentative challenge to SMCRA rejected in *Hodel*. Unlike the property owners in *Hodel*, Benefits has presented solid proof of the impact of SMCRA, an impact that on enactment deprived Benefits of all economically viable use of its coal property. We are not at liberty to disregard, as the government would have us do, the complex and voluminous proofs presented to the Claims Court and on which that court based its detailed findings of SMCRA's investment-destroying impact on the particular deposit known as Whitney coal. Those findings were not the result of some general discussion of the statute, but were compelled by the evidence and have not been shown to have been clearly erroneous.

### b. *The Coal Exchange*

Choosing to disregard what this court had to say in *Whitney Benefits*, 752 F.2d at 1557–1559, about the coal exchange provision, 30 U.S.C. § 1260(b)(5), and this court's language distinguishing *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the government relies primarily on *Penn Central* in arguing that the coal exchange gave Benefits "something of significant value" and thus SMCRA could not have been a taking.

The government's election to present its coal exchange argument on this appeal is difficult to understand in light of this holding of this court:

> the exchange transaction is a method of ascertaining and paying just compensation for a taking, which may be negotiated and agreed upon either before or after the taking itself, and is optional with the claimants, who may reject any exchange

and pursue a money award under the Tucker Act, 28 U.S.C. § 1491.
*Whitney Benefits*, 752 F.2d at 1560.

Though the government asserts that the possibility of an exchange represented a post-SMCRA value, it offered no evidence thereof at trial and the segment of its brief devoted to the exchange provision contains not a single record citation. When the government does not disregard the language in our earlier opinion, it manages to misinterpret it, taking this court's *distinction* of *Penn Central*, 752 F.2d 1557, ("a regulation not meant to take an interest in land") and the indication that in cases *like Penn Central* an exchange provision might be considered in determining whether and when a taking occurred, as a basis for charging error in the Claims Court's failure to do so. The government apparently failed to notice that in *Penn Central* the owners retained the railroad station and that in this case the Claims Court found a total destruction of Benefits' coal property right.

Benefits points to a district court's May 1985 finding that the government had "unreasonably delayed" in performing an exchange, the government's response to an order of that court in which the government said Whitney coal had no value, the government's pretrial and post-trial switching between offers of Hidden Water and Ash Creek, and the government's insistence on valuing any exchange at the vastly depressed coal prices in effect at the time of the exchange. Disputing none of that, the government's reply brief says we must not look at any of it, or at any event in the last 13 years, because it all occurred after enactment of SMCRA.[8] Whatever may be the validity of the government's strident insistence that the words of the statute must serve as absolutely the sole evidence on the question of whether SMCRA was a taking, the argument avails the government nothing when one looks to the statutory words, and particularly to those relating to the exchange provision.

---

8. In its main brief segment on the coal exchange, the government cites a post-enactment fact (again without record reference): "the government has now proceeded to offer an exchange of coal in this case."

Among the portions of this court's opinion in *Whitney Benefits* disregarded by the government is this:

We repeat the statutory words—

It is the policy of congress that the Secretary shall develop and carry out a coal exchange program to *acquire* private fee coal precluded from being mined by the restrictions of this paragraph (5) in exchange for federal coal which is not so precluded. [Emphasis supplied.]

752 F.2d at 1559.

Thus the statutory exchange provision itself in this case confirms the presence of a taking ("acquire") of Benefits' "fee coal precluded from being mined by the restrictions of this paragraph (5)". That the government may in a statute take property and simultaneously offer to pay for it may evade a constitutional challenge. But a compensated taking is still a taking. An offer to pay would make no sense if nothing were taken. The exchange provision confirms the presence of a taking of coal to which it applies and the statute itself, 30 U.S.C. § 1260, *supra* note 2, establishes its application to Whitney coal.

As the Claims Court correctly held, SMCRA destroyed all economic value in Whitney coal. As this court held in *Whitney Benefits*, 752 F.2d at 1557, the exchange provision cannot be made mandatory without raising serious constitutional questions. To hold that mere presence of an exchange provision precludes a court from finding a taking on enactment in cases like this one would eviscerate the constitutional just compensation guarantee.

### 5. *Congress' Motivation*

▆ The government's effort to visualize and then to apply to this case a "nuisance exception" that would justify the total uncompensated destruction of Benefits' investment-backed expectations in its Whitney Coal property is twice-flawed: (a) there has been no showing that the facts in this case correspond to those in earlier cases

dealing with injury to public health and safety; and (b) expressly recognizing the need to balance the continuing dual need for agriculture and the energy available from coal, Congress *permitted* continued surface mining of coal underlying some AVFs, indicating its view that all AVF mining was not in itself a "nuisance".

### a. *Facts in Earlier Cases*

Citing phrases from opinions in earlier cases, the government appears to have lost sight of the critical role of facts as the foundation stones on which law and precedent must stand. Relying primarily on *Keystone Bituminous Coal Ass'n. v. DeBenedictis*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987), the government argues that SMCRA's AVF prohibition effected no taking because it was aimed at a public purpose entitled to "deference". Nothing in *Keystone*, however, supports the notion that public purpose alone permits total destruction of property rights without compensation. The government simply ignores *Keystone's* analysis: a regulation effects a taking if it *either* (1) "does not substantially advance legitimate state interests," *or* (2) "denies an owner economically viable use of his land." 480 U.S. at 470, 107 S.Ct. at 1232–34, quoting *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, and citing *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. *See also Kaiser Aetna v. United States*, 444 U.S. 164, 174, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979) (these are "entirely separate question[s]").

Under the second prong of the analysis in *Keystone*, SMCRA denied Benefits all use of their property and completely destroyed its value. Thus Benefits is in the position occupied by the citizens in *Mahon*, who were denied all economically viable use of their coal, and in a fundamentally different position from that of the citizens in *Keystone*, who were not.[9] In *Keystone*, the Subsidence Act simply required a small

---

**9.** Professor Tribe, in noting that *Mahon* remains good law after *Keystone*, spoke of the "rare takings case in which, as the result of a legislative enactment, it was impossible for the parties to engage in their business profitably." L. Tribe, *American Constitutional Law*, 591 n. 14 (2d ed. 1988). The present is such a "rare takings case".

portion (1.8%) of the involved coal to be left in the ground. 480 U.S. at 496, 107 S.Ct. at 1247–48. That was critical to the Court, which noted "... petitioners have not claimed, at this stage, that the Act makes it commercially impracticable for them to continue mining their bituminous coal interests in western Pennsylvania. *Indeed, petitioners have not even pointed to a single mine that can no longer be mined for profit.*" 480 U.S. at 495–96, 107 S.Ct. at 1247 (emphasis added). As the record here makes plain, Whitney coal is such a mine.

Thus, in the present case, as in *Keystone*, the surface-related purpose of the statute is valid, but not controlling. The Court in *Keystone* went on separately to analyze the *impact* of the regulation on the properties before it, and found evidence of value destruction wanting. Here the Claims Court also thoroughly analyzed the *impact* of SMCRA, and correctly found compelling the evidence of value destruction. The evidence having shown the total destruction of all economically viable use, the conclusion is inescapable that SMCRA constituted a taking of the Whitney coal property. That the government may certainly do, but when it does so in the circumstances of this case it is required by the Constitution to pay just compensation.

#### b. *Congress' Purpose*

The Claims Court quoted from the statute Congress' purpose in enacting SMCRA: [10]

[to] assure that the coal supply essential to the Nation's energy requirements, and to its economic and social well-being is provided and [to] strike a balance between protection of the environment and agricultural productivity and the Nation's need for coal as an essential source of energy.

That Congress was not in SMCRA abating a "nuisance", within the meaning of Supreme Court and other cases discussing such abatement, is clear. In accord with the dual purpose it stated, Congress expressly *permitted*, in the grandfather clause, the continued mining beneath AVFs of all grandfathered mines and all mines found by State Authorities to have minimal AVF involvement, hardly the action of one out to abate a "nuisance" or anything "injurious to the health, morals, or safety of the community", *Keystone*, 480 U.S. at 489, 107 S.Ct. at 1244. Congress also provided for regulations designed to restore the hydrologic balance affected by such mining, regulations Benefits proved it could have complied with in mining Whitney coal. Nonetheless, SMCRA expressly provided that "No permit ... shall be approved" for a mine such as Whitney coal which underlies the AVF precisely as described in the statute. SMCRA, as above indicated, thus destroyed all value in Whitney coal.

The Claims Court went on to note, and we agree, that the present case "presents a dispute where a proper government purpose, protecting agricultural land, must be balanced against the absolute diminution in value of the property at issue that the court has found." The government has not cited to us a single case in which the Supreme Court has relied on the "public purpose" of a regulation or statute as a basis for finding that no taking occurred when, as here, the *entire value* to the owner of the involved property *was destroyed*. The government's talismanic cry for reversal because "public purpose" requires "deference" is simply a too-facile misapplication of the constitutional parameters of takings law to the facts in this case.

#### B. *Valuation*

■ After a six-day trial, the Claims Court considered every evaluation issue addressed and all evaluation evidence sub-

---

**10.** The government unfairly criticizes the trial court, saying it "virtually ignored this aspect of takings analysis". The contrary is true. *See* 18 Cl.Ct. at 406. The government's true complaint is that the Claims Court relied on modern Supreme Court cases and refused to agree with the government's arguments based on the "police power" cases decided in 1887 and 1928: *Mugler v. United States*, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205; *Miller v. Schoene*, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568. Amicus' brief presents a thorough review of the metamorphosis of takings jurisprudence, citing and discussing cases decided over the years 1853 through 1987.

mitted at trial. It then made and explained detailed findings, some for Benefits and some for the government. On appeal, the government fails to show that any finding of the Claims Court was clearly erroneous.

We need not tarry long on the government's evaluation arguments because: they rest basically on a complaint that the Claims Court agreed more often with Benefits' experts than it did with the government's; each of the challenged findings is supported in the record and citation of conflicting testimony does not establish error in the findings made [11]; the Claims Court's use of alternative assumptions, agreeing fully with neither side, represented not error, but reasoned decisionmaking [12]; much of the government's attack is pure attorney argument, much is presented without reference to the record, and much is an inappropriate effort to retry the case with positions rejected by the Claims Court, but without mention of the basis for those rejections; and some of the government's statements misinterpret and mischaracterize the record, others simply disregard the Claims Court's expressed credibility determinations, and still others are assertions on which the government submitted no evidence at trial. In sum, the government's attack on virtually every evaluation finding, including those in its favor, totally fails to establish reversible error.

Mindful of the Supreme Court's admonition that an evaluation must be made "in light of all the facts affecting market value" and that inclusion of value elements dependent upon events requires that those events be "fairly shown to be reasonably probable," *Olson v. United States*, 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934), we have carefully searched the 17 pages of the government's briefs devoted to the evaluation issue and compared them with the record without finding that any of the events involved in the Claims Court's analysis had not been "fairly

shown to be reasonably probable". The government's attack on the Claims Court's acceptance of parts of the Boyd plan is merely a statement of those events government counsel thinks would have been reasonably probable—a totally inadequate basis for either reversing or, as the government suggests, remanding this case for a new evaluation.

Contrary to implications in the government's briefs, the Claims Court did not blindly accept the Boyd plan. On the contrary, after careful review, it reduced the forecast of tons per year from 4 to 2.5 million, reduced the market value of Whitney coal by one-third, and made other findings on specific details that differed from those in the Boyd plan.

The Claims Court's determination that Benefits is entitled to $60,296,000, plus prejudgment interest from August 3, 1977, is fully supported in the record and is not clearly erroneous.

## CONCLUSION

The Claims Court's judgment is affirmed in all respects.[13]

---

**11.** *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) ("where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.").

**12.** *Branning v. United States*, 784 F.2d 361 (Fed. Cir.1986).

**13.** The Claims Court's award of attorney fees and costs pursuant to 42 U.S.C. § 4654(c) (1982) is not challenged on this appeal.