AMBASE CORPORATION and Carteret Bancorp, Inc., Plaintiffs,

and

Federal Deposit Insurance Corporation, Plaintiff–Intervenor,

v.

The UNITED STATES, Defendant.

No. 93–531C.

United States Court of Federal Claims.

Aug. 31, 2004.

Charles J. Cooper, with whom were Michael W. Kirk, David H. Thompson, and Hamish P.M. Hume, of Washington, D.C., for plaintiffs.

Andrew Gilbert, Federal Deposit Insurance Corporation, Washington, D.C., for plaintiff-intervenor.

David A. Levitt, Attorney, Civil Division, Department of Justice, Washington D.C., with whom were Tonia J. Tornatore, Attorney, Jeanne E. Davidson, Deputy Director, David M. Cohen, Director, and Stuart E.

Schiffer, Deputy Assistant Attorney General, for defendant.

## ORDER AND OPINION

SMITH, Senior Judge.

The Court has before it Plaintiff Ambase Corporation's Motion to Dismiss the FDIC and to Define the Measure of Carteret's Contract Damages, filed with this Court on September 17, 2003. The Motion presents a question of the jurisdiction of the United States Court of Federal Claims in *Winstar* cases, and the Court provides this opinion after extended briefing and an oral argument on the matter. Although the Motion was presented as a single brief, for purposes of clarity the Court will separate the arguments into two separate motions, one to dismiss the FDIC and the other to review the exact value of the Carteret receivership. The factual basis for these claims was outlined extensively in this Court's previous opinion in this matter, *Ambase Corp. v. United States*, 58 Fed.Cl. 32 (2003), and will not be repeated here.

## I. MOTION TO DISMISS THE FDIC

■ The first of the two arguments advanced by the Plaintiffs' Motion is that the FDIC must be dismissed as an Intervenor/Plaintiff. The Plaintiffs argue both that the FDIC does not have standing to seek any recovery of losses suffered by the government insurance fund, and that the FDIC has a conflict of interest preventing it from zealously pursuing the recovery of damages that exceed the value of the receivership deficit. This conflict stems from the FDIC's administration of the receivership which Plaintiffs allege has created a deficit that far exceeds what it would have been under a more responsible administrator, and threatens to preclude the Plaintiffs from recovering any damages as the result of a recent change in Federal Circuit law. This alleged mismanagement serves as the basis for the second motion, addressed below.

The issue of dismissal was considered fully at a status conference attended by all parties, and need not be addressed at length here. In this case, the FDIC is an indispensable party as the successor to the rights of Carteret, which include the breach of contract claims that the shareholder Plaintiffs seek to pursue derivatively. The claims of Carteret cannot proceed without Carteret or its legal successor (in this case, the FDIC) as a party to the litigation. *See, e.g., Ross v. Bernhard,* 396 U.S. 531, 538, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970) (In a shareholder's derivative suit, "[t]he corporation is a necessary party to the action; without it, the case cannot proceed."). Although counsel for the FDIC and counsel for the shareholder plaintiffs may have differing views of how to proceed in this litigation, such differences are not inherent to *Winstar* litigation and do not merit a change in the basic law of intervention and representation. The Motion to Dismiss the FDIC is DENIED.

## II. MOTION TO DEFINE THE MEASURE OF CARTERET'S CONTRACT DAMAGES

■ The second argument in the Plaintiffs' Motion addresses this Court's jurisdiction to review the FDIC's administration of the Carteret receivership when determining the value of the damages to be awarded to the Plaintiffs as a result of the breach of contract by the government. *See Ambase Corp.,* 58 Fed.Cl. 32 (finding liability on the part of the Defendant for breach of contract). According to the FDIC, the Carteret receivership is, as of December 31, 2002, operating under a deficit of $229 million. (FDIC Report 3, Projected Receivership Results using Adjusted 12/31/2002 Balances, Ex. A to Ambase's Reply Brief in Supp. of Its Mot. to Define the Measure of Carteret's Contract Damages.) Pursuant to the Federal Circuit's decision in *Bailey v. United States,* 341 F.3d 1342 (Fed.Cir.2003), discussed in greater detail below, the amount of damages recovered by the Plaintiff must be reduced by the amount of the receivership deficit. Thus, were the Plaintiffs to be awarded the full franchise value of the thrift at the time of the breach ($266 million, according to the Plaintiffs), subtracting the $229 million deficit from that sum would leave the Plaintiffs with a $37 million recovery. Given that the size of the deficit is increasing considerably with every passing year due to the accumulation

of interest, the deficit might well swallow the amount of possible recovery, rendering this a case without a controversy and requiring the dismissal of the complaint. *See Bailey,* 341 F.3d at 1347. Plaintiffs argue that fairness demands that this Court review the receivership deficit to ensure that their damages award is not unduly reduced as the result of mismanagement by the FDIC.

Plaintiffs posit several ways in which the FDIC has mismanaged the receivership resulting in an unfair reduction of the amount of their potential damages award. For instance, they claim they can prove that a 1995 tax assessment of $32 million was erroneously assessed. By the end of 2002, this assessment had grown to $76.35 million with interest and penalties for late filing. (Ambase's Reply Brief at 2.) The bulk of the remaining deficit is the result of compounded interest being charged on the FDIC's $18.75 million subrogated claim on behalf of Carteret's depositors as well as its administrative costs incurred as receiver. *Id.*

The question before the Court at this point is not the evidentiary question of whether these values are accurate or appropriate. Rather the Court is asked to determine, as a matter of law, the threshold issue of whether it may even pursue those evidentiary questions or whether the actions of the FDIC as receiver are immunized from judicial review.

The Court's jurisdiction in this area is defined by the Tucker Act, 28 U.S.C. § 1491 (2003). The Tucker Act allows for private parties to sue the United States government in this Court for a breach of contract, and permits the recovery of money damages. The Tucker Act does not grant this Court jurisdiction over tortious claims, nor does it permit this Court to hear claims between private parties. Thus, it must be determined whether these limitations bar the Court from hearing the claims that the Plaintiffs put forth in this case.

## A. The Court's Jurisdiction Over Shareholder Derivative Suits

Plaintiffs first draw on Federal Circuit caselaw permitting shareholder derivative suits to be brought in the United States Court of Federal Claims, pointing primarily to *First Hartford Corp. Pension Plan v. United States,* 194 F.3d 1279 (Fed.Cir.1999). In *First Hartford,* the Federal Circuit recognized that the FDIC had a "manifest conflict of interest" in pursuing damages against the federal government on behalf of a failed bank when the damages were the result of FDIC action, and thus equity required that the shareholders be granted standing to pursue those damage claims. 194 F.3d at 1295. While the act of granting standing to shareholders sounds in equity, the remedy being sought by plaintiffs (money damages against the federal government) clearly falls within the court's jurisdiction. Thus, the Federal Circuit found that shareholders' derivative suits were permissible in the Court of Federal Claims.

The Plaintiffs in this case pursue the "conflict of interest" logic of *First Hartford* and claim that in instances of manifest conflict of interest, the Court should exercise its power to direct pro rata recovery by the shareholders in order to prevent the corporate wrongdoer from recovering the damages. This is essentially what the Ambase Plaintiffs wish this Court to do, by awarding the value of the receivership to the shareholder Plaintiffs without first reducing it by the size of the deficit allegedly created by the corporate wrongdoer. However, such cases are rare exceptions to the well-established rule in shareholder derivative suits that "the only claim that can be heard is the corporation's contract claim against the government and the only beneficiary of any relief will similarly be the corporation." *First Hartford,* 194 F.3d at 1293.

The government and FDIC respond by focusing on the uniqueness of Plaintiff's theory. Plaintiffs have not pointed to a single example of such direct recovery in a case brought before the United States Court of Federal Claims. The cases Plaintiffs point to, in which the courts have directed a ratable recovery to shareholders, were all suits between private parties in district courts not constrained by the Tucker Act. *See, e.g., Southern Pacific Co. v. Bogert,* 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099 (1919); *Perlman v. Feldmann,* 219 F.2d 173 (2d Cir.1955). Ambase's claim that the FDIC has misman-

aged the Carteret receivership is a claim against the FDIC, but for purposes of this litigation this is not a claim against the government. The FDIC is not generally considered to be the government for jurisdictional purposes in *Winstar* litigation. *See, e.g.,* *O'Melveny & Myers v. Fed. Deposit Ins. Corp.,* 512 U.S. 79, 85, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994); *I.K. Frazer v. United States,* 288 F.3d 1347, 1354 (Fed.Cir.2002). This issue is certainly not crystal clear. Within its resolution are buried such constitutional metaphysics as the nature of sovereignty, institutional personality, and separation of function. The government opposed the intervention of the FDIC under its understanding of both justiciability and the Tucker Act. The Plaintiffs now legitimately raise similar concerns. However, the Federal Circuit, along with this Court, have found the FDIC receiver could intervene *against* the United States. Under prevailing constitutional law, the FDIC receiver therefore cannot *be* the government as well. Thus, this claim between two non-governmental parties would seem to fall outside the jurisdictional limitations of the Tucker Act.

The analogy of this case to *First Hartford* is not very persuasive, as the "manifest conflict of interest" contemplated by *First Hartford* is not as clearly present in this case. The breach of contract that the Ambase Plaintiffs seek ultimately to remedy is the result of action by Congress (the passage of FIRREA), rather than action by the FDIC. The Plaintiffs must therefore appeal to the Court's equitable powers to hear an aspect of their complaint that would otherwise seem to be procedurally barred. The government and FDIC in this case take the position that the Court may not hear this complaint *because* it requires an equitable decision to do so. Labeling an argument "equitable" does not, however, automatically deprive this Court of jurisdiction. The assumption that this Court has no equity jurisdiction is an "ancient but inaccurate shibboleth." *Quinault Allottee Ass'n v. United States,* 197 Ct.Cl. 134, 453 F.2d 1272, 1274 n. 1 (1972). The Court does not have the jurisdiction to grant specific equitable remedies, but "[t]his principle does not preclude the courts from exercising equitable powers as an incident of our general jurisdiction." *Pauley Petroleum, Inc. v. United States,* 219 Ct.Cl. 24, 591 F.2d 1308, 1315 (1979) (citing *Klamath & Modoc Tribes v. United States,* 174 Ct.Cl. 483, 488, 1966 WL 8850 (1966)) (internal citations omitted). Plaintiffs in this case ask nothing more of this Court than the exercise of its equitable power incident to their claim for money damages against the federal government, a claim which lies squarely within our jurisdiction.

In *Suess v. United States,* 33 Fed.Cl. 89 (1995), this Court held that FIRREA did not prevent shareholders from bringing a derivative suit, despite language which granted all powers and rights of the shareholders to the receiver. *Id.* at 95–96 (citing 12 U.S.C. § 1821(d)(2)(A)(i) (1995)). A second section of FIRREA made clear that the shareholders had a right to any surplus after the payments of all claims and expenses, 12 U.S.C. § 1821(d)(11)(B), and thus the claims of the shareholders attempting to recover that surplus could be heard. It strikes this Court as surprising that it might have the power to award a surplus in such a case but not the power to determine the precise amount of that surplus; yet this is what the position of the FDIC and the government would suggest. A deficit, of course, is the flip side of a surplus. The FDIC and the government would have this Court rely on the naked assertions of the FDIC as to whether there is a deficit or a surplus, and what the amount of either happens to be. Were the FDIC to assert that the receivership is currently in debt for ten billion dollars, it is the FDIC's position that this assertion must be accepted at face value, and the case immediately dismissed as moot. This is the assertion of a judicially non-reviewable administrative power. Such power, of course, is not the norm of our constitutional system. It has only been allowed in cases where the Constitution has clearly given the power exclusively to either the Congress or the President. In such cases, a political remedy protects liberty where judicially manageable standards are nonexistent; as, for example, in most matters of foreign policy. *See* *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

Ironically, at oral argument the FDIC argued that the discovery process would protect against abuse. Yet if the discovery process resulted in a complaint by the shareholder Plaintiffs that the receivership had been misadministered, the FDIC's position would appear to be that this Court could not hear such a complaint.[1] Such a scenario denies Plaintiffs any meaningful ability to obtain the type of remedy that Congress has given us the duty to provide. The Court has not, to this Court's knowledge, embarked on this type of close scrutiny of a receivership before in previous *Winstar* litigation. However, such scrutiny was not necessary prior to the ruling in *Bailey* and thus it was unlikely to have been at issue.

## B. The FDIC Act's Limitations on Judicial Review

The FDIC's main defense is that language contained within the FDIC Act prevents this Court from reviewing its management of a receivership, or indeed any of its actions as a receiver. The FDIC points to 12 U.S.C. § 1281(d)(13)(D), entitled "Limitation on Judicial Review." This section reads:

Except as otherwise provided in this subsection, no court shall have jurisdiction over–

(i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or

(ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

Plaintiffs argue persuasively that they are not barred by § 1281(d)(13)(D)(i), as their claim against the FDIC is not a "claim … for payment from … the assets" of the receivership. Rather, they wish this Court to evaluate the FDIC's claims as to the exact value of the receivership, based upon trial evidence in determining Plaintiffs proper share of any award; the Court would then use this figure when calculating the damages awarded to the Plaintiffs. However, the Plaintiffs' argument, described in this way, arguably implicates § 1281(d)(13)(D)(ii), which prohibits judicial review of any "claim relating to any act or omission of [the FDIC] as receiver."

No one phrase of the FDIC Act should be read too narrowly without first placing it in context. § 1281(d) "establishes a scheme for the determination, review, and payment of claims" brought against a "failed financial institution." *Coast–to–Coast Fin. Corp. v. United States,* 51 Fed.Cl. 358, 360 (2002). As the first major step in this mechanism, § (d)(6) gives "claimants" 60 days either to seek administrative review or to sue directly in District Court in order to challenge the FDIC's disallowance of their claim. It would be difficult to argue that should a claimant choose to sue in District Court, their suit would then be precluded by a universal prohibition on judicial review contained within § 1281(d)(13)(D). Rather than create an impossible *Catch–22* situation, this section serves only to prevent claimants from seeking a judicial remedy outside of this established procedure; it requires claimants "to first exhaust administrative remedies." *Freeman v. FDIC,* 56 F.3d 1394, 1400 (D.C.Cir.1995). *See also Homeland Stores v. RTC,* 17 F.3d 1269, 1274 (10th Cir.1994). Plaintiffs did first pursue a remedy in a District Court, and the suit was eventually transferred to this Court because of this

---

1. It simply cannot be the case, as the government suggested at oral argument, that 12 U.S.C. § 1821(d)(6)(A) requires the Plaintiff shareholders to begin new litigation in a United States District Court in order to test whether the receivership has been administered correctly. 28 U.S.C. § 1500 (2003) denies jurisdiction to the United States Court of Federal Claims over any claim taken to a District Court, and thus the shareholder Plaintiffs would be stuck in a *Catch–22* situation. Plaintiffs who have spent years in this Court pursuing this litigation would suddenly find themselves in a new forum with a new court and would likely have to start much, if not all, of the litigation over. While such situations may occasionally arise when a court is deprived of subject matter jurisdiction, this burdensome and time-consuming process can hardly be relied on as a method that ensures the Plaintiffs protection against the potential abuse of a nonreviewable receivership administered by the FDIC.

Court's exclusive jurisdiction over the claim. Likewise, this claim was not *against* the receivership, but rather against the United States for breach of a goodwill contract. As noted above at footnote one, the Plaintiffs cannot be required to go back to a District Court now to pursue this particular aspect of their damages suit, because that would then divest this Court of jurisdiction over the rest of the litigation. Such a result, of course, would deprive the Plaintiffs of any remedy since the District Court could not award monetary relief. This variation of the "heads I win, tails you lose" argument comes closer to "heads I win, tails I keep your money regardless." § 1281(d) does not prevent this Court from exercising jurisdiction over the Plaintiff's claims relating to the size of the FDIC's receivership deficit in the present case.

The Defendant and the FDIC also rely on § 1281(j), which they argue places a much broader restriction on the Court's jurisdiction. That section is entitled "Limitation on Court Action" and reads in full: "Except as provided in this section, no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the Corporation as a conservator or a receiver." The government and the FDIC point to the Ninth Circuit's decision in *Sahni v. American Diversified Partners*, 83 F.3d 1054 (9th Cir.1996) for the proposition that the FDIC's actions as receiver may in no way be subject to judicial review. However, that case is distinguishable from the present case in an important way. In *Sahni*, the plaintiff was the previous owner of a bank which was declared insolvent and which the FDIC took over as receiver. The FDIC liquidated many of the bank's assets, including the sales of several limited partnerships whose purposes were to build apartment projects financed largely by the Department of Housing and Urban Development (the "HUD partnerships"). 83 F.3d at 1056. Sahni filed

five lawsuits in state court seeking to rescind the FDIC's sales of the HUD partnerships. The claims were consolidated and moved to a district court, which granted the FDIC's motion to dismiss. The Ninth Circuit affirmed, holding that § 1821(j) prevented review of the sales. *Id.* However, the court specifically noted that the actions taken by the FDIC were well within the specifically enumerated powers granted by various sections of 12 U.S.C. § 1821,[2] and to rescind those actions would be tantamount to granting an injunction against those actions in violation of § 1821(j). Here Plaintiffs seek to determine the size of the receivership amount so a damage claim against the government, not the receiver, may be apportioned.

§ 1281(j) is not directed to the pursuit of money damages *ex post* as the result of FDIC actions. Instead, this section is intended to prevent injunctive relief against the FDIC's actions as receiver.[3] This serves the important purpose of insuring that purchasers of assets from the FDIC receivership can purchase with full confidence. This concern is in no way implicated by Plaintiffs' claim here. Plaintiffs in the present case do not seek rescission. This section, like 12 U.S.C. § 1821(d)(13)(D), is inapposite and does not prevent this Court from hearing the Plaintiff's claims.

## C. *Whitney Benefits*

In *Whitney Benefits, Inc. v. United States*, 25 Cl.Ct. 232 (1992) ("*Whitney Benefits*"), this Court held that it had jurisdiction over the apportionment of damages even though the overall liability of the government would not change. *Whitney Benefits* involved an inverse condemnation claim concerning coal mining rights, and the court found that a taking had occurred and that the plaintiffs were entitled to damages. *Whitney Benefits, Inc. v. United States*, 18 Cl.Ct. 394 (1989) ("*Whitney I*"), *modified*, 20 Cl.Ct. 324 (1990), *aff'd*, 926 F.2d 1169 (Fed.Cir.1991). The two plaintiffs disagreed over how the damages

---

2. *E.g.*, § 1821(d)(2)(B)(i) (granting power to "take over the assets ... and conduct all business of the institution"); § 1821(d)(2)(E) (FDIC may liquidate the institution's assets); § 1821(d)(2)(G)(i)(II) (FDIC may "transfer any asset or liability of the institution in default").

3. This argument regarding 12 U.S.C. § 1821(j) was first raised in the FDIC's Surreply, and the Ambase plaintiffs filed an additional memorandum in response. Ambase's Motion for Leave to Respond is hereby GRANTED.

should be apportioned between them, and filed a motion asking the Court to rule on the apportionment.

The plaintiffs in *Whitney Benefits* were each seeking less than one hundred percent of the damages award, but the combined amounts sought by the parties exceeded the total damages award. Citing Court of Claims precedent asserting jurisdiction over competing claims of private parties whenever the United States government was the stakeholder of the money to be used to pay the claims, this Court decided that the government was a stakeholder in *Whitney Benefits* as well, for jurisdictional purposes. "[A]ll parties should be included in the suit who had an interest in the claim, because if a party with an interest was not included and later sued based on its interest, the government might incur double liability." *Id.* (citing *Great Am. Ins. Co. v. United States,* 184 Ct.Cl. 520, 397 F.2d 289, 292 (1968)). In that situation, it was clear that the Court of Claims retained the authority to apportion a judgment between competing plaintiffs. *Id.* at 234 (citing *Hoopa Valley Tribe v. United States,* 219 Ct.Cl. 492, 596 F.2d 435 (1979)). In the present case, the United States is also the stakeholder of the damages award, should there be any damages.

The second rationale of *Whitney Benefits,* that asserting jurisdiction was "strongly" supported by the interests of judicial economy, is also relevant here.

> It would be unfair to place the burden of apportioning the damages on another court when this court is already familiar with the extensive facts of this large and complex case.... It is clearly a far more efficient use of judicial resources for this court rather than a new trial court to make the final determination concerning how the judgment should be apportioned.... The court may not now abandon the task it began when it decided that just compensation was due.

*Whitney Benefits,* 25 Cl.Ct. at 233.

The Court of Federal Claims and its predecessor courts have always possessed the power to assert jurisdiction over claims which sound in equity but which are claims for money damages against the government rather than a claim for non-monetary relief. Thus the Court has relied on reformation of contract as the basis for a money judgment, *United States v. Milliken Imprinting Co.,* 202 U.S. 168, 174–74, 41 Ct.Cl. 509, 26 S.Ct. 572, 50 L.Ed. 980 (1906), used equitable accounting procedures to render a money judgment, *Klamath & Modoc Tribes,* 174 Ct.Cl. at 490, has permitted a class action suit prior to the existence of RCFC 23, *Quinault Allottee Assoc.,* 197 Ct.Cl. 134, 453 F.2d 1272, heard suits for rescission of contract due to mutual mistake or frustration, *see, e.g., Pauley Petroleum,* 219 Ct.Cl. 24, 591 F.2d 1308, and heard shareholder derivative suits despite their being historically based in equity, *First Hartford,* 194 F.3d 1279. The Court of Claims, in permitting the use of the class action procedure, clarified the equitable powers of the Court:

> There is no reason why this court cannot use the [class action], if it is appropriate. So long as relief is confined to a money judgment, there is nothing in the type of jurisdiction we have, or the fact that claims in this court are normally against the United States, to deprive us of this modern aid to speedier and less repetitious litigation. Congress has limited us to monetary judgments but it has not said or implied that we cannot use new procedural techniques, if we consider them advisable, in deciding whether or not to make monetary awards in fair and efficient fashion. The directive that waiver of sovereign immunity not be read expansively goes to the relief we can award, the subjects we can consider, and the timing of claims, not the intermediate procedural steps we take in cases plainly within our jurisdiction.

*Quinault Allottee Assoc.,* 453 F.2d at 1274. The Court of Claims' understanding of the nature of its jurisdiction still binds this Court. *See South Corp. v. United States,* 690 F.2d 1368 (Fed.Cir.1982) (United States Court of Federal Claims is bound by precedent from the Court of Claims). In this case, Plaintiffs do not ask the Court to expand its jurisdiction, but rather to conduct an equitable review which is "an incident of our general jurisdiction." *Klamath,* 174 Ct.Cl. at 488, 1966 WL 8850. In the interest of judicial

economy and the speedy administration of justice, the Court must accurately and fairly determine the amount of claims that are otherwise "plainly within our jurisdiction," and determine "monetary awards in fair and efficient fashion." *Quinault Allottee Assoc.,* 453 F.2d at 1274.

We turn now to the Federal Circuit's recent decision in *Bailey,* which is the impetus for much of the battle being waged by the Plaintiffs over the precise size of the receivership deficit.

### III. BAILEY

After this Court issued its decision as to the liability of the United States for a breach of contract, but before litigation of the damages to be awarded could begin in earnest, the Federal Circuit issued its opinion in *Bailey v. United States,* 341 F.3d 1342 (2003), and changed the manner in which damages may be awarded for a breach of contract in *Winstar* cases.

*Bailey* involved a suit by the FDIC and a plaintiff shareholder against the United States for breach of contract as a result of the enactment of FIRREA, as does the present case. The Court of Federal Claims ruled that as a result of the breach, shareholder plaintiff Bailey had a direct interest in any surplus recovery by the FDIC. *Fed. Deposit Ins. Corp. v. United States,* 47 Fed.Cl. 2 (2000). However, following summary judgment motions with respect to damages, the Court dismissed the FDIC's and Bailey's contract claims for lack of Article III standing.

The Federal Circuit upheld this dismissal, addressing first the claims based in contract. The subrogated claim held by the FDIC (which managed the claims held by the FSLIC Resolution Fund) was $66 million, which exceeded the maximum possible recovery of the plaintiffs by $2 million. The court held that "[t]he expectation damage claim is therefore a nonjusticiable intra-governmental dispute because any damage award recovered from the government by the FDIC would flow to the [FSLIC Resolution Fund], from one government coffer to another." *Bailey,* 341 F.3d at 1346 (citing *Landmark Land Co. v. Fed. Deposit Ins. Corp.,* 256 F.3d 1365, 1382 (Fed.Cir.2001)). Thus, the FDIC was dismissed for lack of standing.

The court then reviewed the takings claims of the FDIC and dismissed them as well. Noting that "the receivership deficit may not be included in any recovery by the FDIC for Security Savings," *id.,* and that the remaining claim for $14.8 million (the value of the thrift at the time of FIRREA's passage) was exceeded by the amount owed to the FSLIC Resolution Fund, the takings claim too was dismissed for lack of Article III standing as an intra-governmental dispute.

This analysis rested on the court's explanation of how expectancy damages are to be calculated. The figures Bailey and the FDIC requested included a receivership deficit of $68.2 million as well as the estimated value of the bank's assets in the absence of the breach of contract. The court held that the plaintiffs could not recover the amount of the receivership deficit because their theory "is premised on the false assumption that the receivership deficit is an asset available for recovery by the FDIC for Security Savings." *Id.* at 1345. Instead, the claim was "predominantly held by the FRF because the largest portion of it is that which was absorbed by the RTC when it paid [the acquired thrift]'s deposit liabilities." *Id.*

It is a familiar axiom of the law that the purpose of a damages award for the breach of a contract is to restore the victim of the breach to the position in which he would have been in were the contract not breached. *See, e.g.,* Dobbs, Law of Remedies, § 1.1, at 3 (2d ed. 1995) ("The damages remedy is a money remedy aimed at making good the plaintiff's losses."); *Bluebonnet Savings Bank, F.S.B. v. United States,* 339 F.3d 1341, 1344–45 (Fed.Cir.2003) ("One of the basic principles of contract damages is that damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation.") (internal quotations and citation omitted); *Acme Process Equip. Co. v. United States,* 171 Ct.Cl. 324, 347 F.2d 509, 528 (1965), *rev'd on other grounds,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966) ("[P]laintiff is entitled only to the traditional

remedy of damages ... The purpose of that remedy is to place the party against which the breach has been committed in the position it would have held if the contract had been fully performed."). Under *Bailey*, since the Ambase Plaintiffs are to have their recovery reduced by the size of the receivership deficit, the Court must determine the size of the deficit or surplus in order to determine the just amount which puts them in "as good a position as [they] would have been in, had the breaching party fully performed its obligation." *Bluebonnet*, 339 F.3d at 1344–45.

Indeed, as the Ambase Plaintiffs vigorously point out, the receivership deficit is so large that only a fraction of the alleged damages may be awarded to them. If this litigation were to continue much longer it is likely that the receivership deficit would swallow the potential award and there could be *no* recovery by the Plaintiffs. This seems an unjust result, especially if the very existence of the receivership deficit is the result of the breach of contract by the Defendant. The Plaintiffs correctly describe the arrangement as follows: the government may prevent Plaintiffs from recovering *any* amount by compounding the interest owed on the receivership deficit and pursuing other actions which enlarge the deficit, and then simply relying on the passage of time to protect the government from recovery.

Suppose, hypothetically, that a contractor contracts to renovate a house, and in the process destroys that house. As remedies for breach of contract are traditionally understood, the contractor would then be obligated to rebuild that house. His fulfillment of this obligation will naturally incur some opportunity costs, as the time spent rebuilding the house is time not spent working on some other, profitable job. Nevertheless, the contractor will not be compensated for this lost time, as the loss is incurred as the result of his own breach of contract. However, in the context of the present case, the government's reading of *Bailey* appears to require exactly that type of compensation to the breaching party. The Court does not believe this is what the Federal Circuit's well-reasoned opinion says on this issue.

Under these circumstances, this Court must carefully review the receivership deficit to permit inclusion of only those costs which are legitimately part of the receivership deficit. This leaves, of course, the logistical question of how to conduct such a review. As a trial on damages is pending in this case, the Court sees no reason to pursue any inquiry into the specifics of the receivership until at least such time as there is a decision that some damages must be awarded. If, after trial, it is determined that no damages are to be awarded, it will render the present question moot.

If it is determined that the Plaintiffs are owed some amount of damages, then evidence will likely need to be presented in order to evaluate the receivership's alleged value. The government makes reference both in its briefing and at oral argument to thousands of document boxes that could potentially require review in order for the Court to consider this claim, but it is this Court's hope that counsel for all parties will be able to present their arguments economically. The Plaintiffs have pointed to two primary arguments regarding the size of the receivership deficit, both of which seem to lie well within the traditional functions of courts. The first is a challenge to a $32 million tax assessment first levied against the receivership in 1995, and the second is the argument that the interest rates being applied to the receivership deficit "would make junk bond investors envious." (Ambase's Reply Brief in Support of its Motion to Define the Measure of Carteret's Contract Damages at 28.) Focusing here should keep the arguments within judicially manageable bounds and should keep the size and complexity of the issues within reasonable constraints.

## CONCLUSION

Ambase's Motion to Define the Measure of Carteret's Contract Damages, to the extent that it requests the Court to consider the size and value of the FDIC's receivership deficit when calculating damages, is GRANTED. The Court hereby SCHEDULES a telephonic status conference for thirty days following

the date of this opinion to set the schedule for further proceedings.

It is so **ORDERED.**