[No. B113906. Second Dist., Div. Four. Mar. 4, 1999.]

SOUTHERN PACIFIC THRIFT & LOAN ASSOCIATION, Plaintiff and Appellant, v.
SAVINGS ASSOCIATION MORTGAGE COMPANY, INC., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and IV.

## COUNSEL

Arter & Hadden, Edwin W. Duncan and Steven J. Cote for Plaintiff and Appellant.

A. Raymond Hamrick III; Raymond C. Dion; and David A. Evans for Defendant and Appellant.

## OPINION

**EPSTEIN, J.**—Southern Pacific Thrift & Loan Association (SPT&L) appeals from judgment against it in this action seeking damages from loan originator and servicer Savings Association Mortgage Company, Inc. (SAMCO) for losses suffered as a loan participant in a low-income housing project. SAMCO appeals from the trial court's denial of its motion for attorney's fees. We find no error and affirm the judgment.

### FACTUAL AND PROCEDURAL SUMMARY

SAMCO is in the business of soliciting financial institutions to participate in pools of commercial loans. It then acts as a loan servicer and administrator under participation agreements with the lending institutions. In this case, SAMCO served as a loan servicer and administrator with respect to a loan on the Hotel Metro, a 193-unit, low-income, single-room-occupancy residence complex in San Diego. SAMCO issued the $2,145,000 Hotel Metro loan to San Diego Single Room Occupancy Limited Partnership (the partnership) in November 1990.

In September 1994, SAMCO began offering approximately $9 million in participation interests in loans originated and serviced by SAMCO which had been acquired by the Resolution Trust Company through the seizure of various institutions. The offering was limited to participants in other SAMCO loans, including SPT&L.

The Hotel Metro project began experiencing financial difficulties in 1993. SAMCO became aware of these problems in June 1994. In October 1994, SAMCO participated in discussions regarding the partnership's difficulties in meeting its loan obligations. SAMCO alerted its loan participants to the problems with the Hotel Metro project by placing it on its November 1994 watch list of troubled loans. The notation for Hotel Metro reported that " 'the borrowers stated that the project cash flow is insufficient to support both continued debt service on the existing loan balance and pay project operating costs and capital repair expenses.' " The December 1994 watch list again warned the loan participants of the difficulties with the Hotel Metro loan, and stated that appraisals of the property were pending. SPT&L, as a participant in other SAMCO loans, received the November and December watch lists, which warned of the Hotel Metro loan problems.

On December 15, 1994, SPT&L purchased a 29.32 percent interest in the Hotel Metro loan for $535,515. The total principal amount owing on the Hotel Metro loan at that time was $2,083,629. SAMCO and SPT&L entered into a loan participation sale and trust agreement on that date. That agreement describes the duties and obligations of the parties with regard to the Hotel Metro loan.

In a process initiated in November 1994 and concluded in March 1995, SAMCO obtained a property appraisal and an operational analysis of the Hotel Metro project. The final appraisal, issued after consideration of the operational analysis, valued the property at $850,000 encumbered, and $900,000 unencumbered.

On June 30, 1995, SAMCO sent a memorandum to each Hotel Metro loan participant setting forth a workout proposal that had been negotiated between SAMCO and the partnership. The workout provided that SAMCO would be paid $800,000 as payment in full for the outstanding loan balance. The June 30 memorandum included a ballot on which the loan participants were to vote in favor of the workout, or in favor of foreclosure. SPT&L voted for foreclosure; other loan participants holding an aggregate interest of

60.67 percent[1] voted in favor of the workout. In accordance with this vote, SAMCO proceeded with the workout.

SPT&L brought this action against SAMCO, alleging fraudulent concealment and misrepresentation with regard to the marketing of the loan participation, and breach of fiduciary duty with regard to the workout which was accepted. Trial was by the court. After presentation of the plaintiff's case, the court granted defendant's motion for judgment on the first cause of action pursuant to Code of Civil Procedure section 631.8. At the conclusion of the trial, the court entered judgment in favor of defendant SAMCO on the second cause of action. The court awarded costs, expert fees and expenses to SAMCO, but denied its motion for attorney's fees. SPT&L appeals from the judgment in favor of SAMCO. SAMCO appeals from the court's denial of attorney's fees.

## DISCUSSION

### I

■ SPT&L claims the trial court erred in refusing to hold that SAMCO owed it contractual and common law fiduciary duties. SPT&L relies on two sections of the adjustable-rate loan participation sale and trust agreement (the Agreement) to support its claim that a fiduciary relationship existed between it and SAMCO. It is appropriate to look to the terms of the Agreement because "[u]nlike the automatic, status-based fiduciary duty which exists, for example, between attorney and client, fiduciary duties among loan participants depend upon the terms of their contract." (*First Citizens Federal Sav. and Loan* v. *Worthen Bk.* (9th Cir. 1990) 919 F.2d 510, 513 (hereafter *Worthen*).)

Section 2.01 of the Agreement provides in part: "Seller as Trustee. It is agreed that the seller [SAMCO] and the Buyer [SPT&L] are not partners or joint venturers, and that the Seller is not to act as agent for the Buyer, but is to act in all loan administration and servicing matters hereunder for the Buyer as an independent contractor and also as a trustee with fiduciary duties with respect to such matters as holding the loan documents, legal title thereto, and the loan receipts hereunder for the benefit of the respective participation interest owner(s)."

We read this portion of the Agreement as setting forth two separate relationships between SAMCO and the loan participants. It expressly establishes that SAMCO is not the agent of SPT&L or the other loan participants,

---

[1]Loan participants holding an aggregate interest of 50.67 percent gave written approval for the workout; one loan participant holding a 10 percent interest gave verbal approval. Only SPT&L voted against the workout.

and that it is an independent contractor as to all loan administration and servicing duties, except as to specifically delineated duties. Only as to these specified duties—the holding of loan documents, legal title, and loan receipts for the loan participants—does the Agreement impose a fiduciary duty on SAMCO, and these are not the acts which gave rise to this lawsuit.

Nor do we find a fiduciary relationship from the use of the word "trustee" in the last sentence of section 2.01, which provides: "It further is agreed that the Seller, as trustee, shall not transfer legal title to such loans except in accordance with ARTICLE V of this Agreement." Article V addresses the situation when the seller or servicer becomes insolvent, breaches the agreement, or is for some other reason incapable of acting as servicer of the loan. Under the described circumstances, the loan participant holding an ownership interest in excess of 50 percent would succeed to the rights and responsibilities regarding the holding and servicing of the loan. The reference in section 2.01 to the "Seller, as trustee," refers to the seller as holder of the loan documents, title, and receipts, in which capacities it acts as a trustee. The provision precludes the seller from transferring the title it holds as trustee except under the succession method set out in article V. It does not create additional fiduciary duties.

SPT&L selectively quotes from section 3.01 of the Agreement to support its claim of fiduciary duty. The sentence immediately preceding the one quoted by SPT&L must be read in order to understand the meaning of this section. The two sentences provide: "Seller warrants that Servicer will administer and service the loans sold hereunder consistent with prevailing good mortgage practice, and applicable law and regulations. In performing its trustee function, Seller shall exercise that degree of care which is legally required of a trustee." These two sentences set out different standards of performance for the different duties SAMCO agreed to perform. When acting as a loan servicer, SAMCO agreed to administer and service the loan in accordance with good mortgage practice and applicable law. When acting as a trustee, SAMCO agreed to act in accordance with the higher standard required of a trustee. This provision does not expand the areas in which SAMCO is a trustee beyond the limited functions specified in section 2.01. It simply sets out the standard of care to be used by SAMCO, depending on whether it is acting as loan servicer or as trustee.

The language in the Agreement parallels the loan participation agreement at issue in *Worthen, supra,* 919 F.2d 510, which provided that defendant Worthen " 'holds the . . . note and any collateral or security documents in trust for' " plaintiff First Citizens. It also described Worthen " 'as a trustee of

all cash received from the borrower, and require[d] that such payments be transmitted to the other participants within five business days of receipt.' " (*Id.* at pp. 513-514.) But the agreement only obligated Worthen to " 'administer and service the loan in accordance with the same degree of care that [Worthen] would exercise in the servicing and administering of a loan as its own account.' " (*Id.* at p. 514.) And, as in the Agreement in our case, the agreement in *Worthen* expressly stated that no partnership existed among the participants and that Worthen's role in administering the loan was that of " 'an independent contractor,' . . ." Under the agreement, the parties were only obligated to make decisions regarding the loan " 'in good faith and in a reasonable manner.' " (*Ibid.*) The Ninth Circuit found these provisions were more indicative of a typical business relationship than a fiduciary relationship. (*Ibid.*) We reach the same conclusion as to the Agreement in this case.

## II

The trial court found that SAMCO was authorized to engage in the shortpay negotiations and to release the security pursuant to section 3.04 of the Agreement. SPT&L argues that the court erred by failing to consider sections 3.11 and 3.12 of the Agreement.

Section 3.04 provides, in pertinent part: "It is agreed that the exclusive right to decide how the loans sold under this Agreement shall be serviced and what to do and how to do it including, but in no way limiting, the right to approve assumptions, is hereby vested in the seller, as Trustee, for all owners of participation interests hereunder subject to ARTICLE III of this Agreement. Seller warrants that except as authorized by Section 3.12, servicer will not waive or modify any right, term or provision of any loan contract under this Agreement, including the right to exercise the due-on-sale clause, without the prior written consent of the owner of a participation ownership interest that exceeds 50% in the pertinent loan(s), as reflected on the Servicer's books and records. In the event no such owner has such a participation interest, the decision hereunder shall be made in the same manner as specified in Section 5.01."

As we have explained, section 5.01 of the Agreement provides that in the event of the insolvency or other inability of the seller or servicer, the owner of more than 50 percent of the loan participation interest shall succeed to the role of servicer. If there is no one person or firm with an interest in excess of 50 percent, then the successor is the loan participant designated by agreement of those participants whose aggregate ownership interests exceed 50 percent.

In this case, there was no one participant with an ownership interest in excess of 50 percent. Reading section 3.04 together with section 5.01, in order for SAMCO to waive or modify a right, term, or provision of the loan contract, it had to obtain the written consent of participants whose aggregate ownership interests exceeded 50 percent. The court found that SAMCO did so, and the evidence supports that finding.

SPT&L argues that section 3.11, not section 3.04, governs the handling of loans in default. Section 3.11(a) provides that in the event of default in payment, "Seller, at its option, but without obligation to do so, will have the right and privilege to repurchase all outstanding participation ownership interests . . . ." Subdivision (b) of section 3.11 provides: "Servicer shall be responsible for foreclosing upon the security property by appropriate procedure to be determined by it, and if, in Servicer's judgment, it is proper, it will buy the security property at the foreclosure sale, or accept a deed in lieu of foreclosure."

SPT&L argues that section 3.11 governed SAMCO's obligations, since the loan was in default, and that it provided SAMCO with only two choices: repurchase outstanding interests under subdivision (a), or foreclose under subdivision (b). We do not agree.

Section 3.04 gives SAMCO authority to decide how to service the loan sold under the Agreement. Its authority includes the right to approve assumptions, and the right to waive or modify the loan contract. While section 3.04 expressly conditions SAMCO's right to waive or modify the loan contract on its obtaining the prior written consent of more than 50 percent of the loan participants, it does not otherwise limit SAMCO's authority to waive or modify the contract. In particular, it does not preclude waiver or modification of the contract in the event of a default on the loan.

Section 3.11 describes additional acts SAMCO is authorized to perform in the event of default: repurchase loan interests or foreclose. It does not mandate that SAMCO perform either of these acts; it simply authorizes SAMCO to do so, and describes its responsibilities in so acting. Neither section 3.04 nor section 3.11 precludes SAMCO from waiving or modifying the contract in the case of loan default, if it has obtained the required consent.

Nor do we find any such limitation in section 3.12, which provides: "If, from time to time, any of the loans covered under this Agreement are endorsed, or insured, or the obligations thereunder are further secured by other collateral, then it is agreed that the Servicer shall, and the Servicer is

authorized to, act for the owners of participation interests with respect to such matters, as their interests may appear. The Servicer is authorized to release collateral security other than the real property described in the security instrument, to waive or collect special fees or charges except for those provided for in section 3.03, and to agree to substitution of personal liability, or to release persons secondarily liable."

Just as section 3.11 described additional acts authorized upon the occurrence of a loan default, section 3.12 describes additional acts authorized in the event the loan is endorsed, insured, or secured by other collateral. Neither section 3.11 nor section 3.12 limits the authority of SAMCO to waive or modify the terms of the loan agreement, as set out in section 3.04. Instead they provide SAMCO with additional authority upon the occurrence of specific events.

The trial court did not err in its interpretation of the Agreement.

III, IV*

. . . . . . . . . . . . . . . . . . . . . . . . . .

V

■    In its cross-appeal, SAMCO seeks reversal of the trial court's denial of its request for attorney's fees. We find no error.

Section 7.06 of the Agreement provides: "Seller and its officers, directors and agents shall be indemnified and held harmless by Buyer from and against any and all liabilities, costs and expenses, including reasonable attorneys' fees and court costs, arising from any claim, demand, action, suit or proceeding associated with (a) any representation or warranty made by Buyer that proves to be false, or (b) any failure by Buyer to fully comply with its obligations under this Agreement. Buyer's indemnity obligations under this section shall survive termination of this Agreement."[2]

This is an indemnity provision, not an attorney's fee provision. (See *Myers Building Industries, Ltd.* v. *Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 968-969 [17 Cal.Rptr.2d 242].) "A provision including attorney fees as an item of loss in an indemnity clause is not a provision for

---

*See footnote, *ante*, page 634.

[2]SPT&L misquotes section 7.06, omitting the word "attorneys" from the sentence, and argues that this is merely an indemnification provision, not an attorney's fee provision. We will assume that this omission was inadvertent.

attorney fees in an action to enforce the contract. Accordingly, such a contractual indemnity provision is not made reciprocal and applicable to the entire contract by . . . Civil Code section 1717." (*Id.* at p. 971.)

SAMCO's right to recover attorney's fees depends on the occurrence of one or more of the conditions for indemnity. SAMCO contends the condition set out in section 7.06(b) was met because SPT&L failed to comply with its obligations under section 7.05 of the Agreement. That section provides: "(a) Buyer represents and warrants to Seller as of the date hereof that Buyer is authorized to purchase participation interests in loans originated by Seller. (b) Buyer will, based on such information as Buyer deems appropriate, continue to make its own decisions with respect to the purchase and ownership of participation interests hereunder." SAMCO claims SPT&L did not meet this obligation because it failed to conduct a due diligence review when purchasing its participation interest.

Section 7.05 requires the buyer to make its own decisions, based on the information the buyer "deems appropriate . . . ." This provision affords the buyer discretion to decide what information it needs in order to make its decisions. SPT&L's failure to conduct due diligence before making its decision to purchase may have been bad judgment, but it is not a failure to comply with its obligations under the Agreement. The indemnity provision of section 7.06 was not triggered by this conduct.

There being no other basis for an award of attorney's fees, the trial court properly refused to make such an award.

### DISPOSITION

The judgment is affirmed. The parties are to bear their own costs on appeal.

Vogel (C. S.), P. J., and Curry, J., concurred.