Filed 7/3/23  Citrus El Dorado v. Stearns Bank CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| CITRUS EL DORADO, LLC, | |
| Plaintiff and Appellant, | E077496 |
| v. | (Super.Ct.No. RIC1602653) |
| STEARNS BANK, et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of Riverside County.  John W. Vineyard, Judge.  Affirmed.

Everett L. Skillman for Plaintiff and Appellant.

Seyfarth Shaw, Giovanna A. Ferrari, Lawrence E. Butler, James M. Harris, and Aaron Belzer for Defendants and Respondents.

A commercial developer lost a parcel of real property in a trustee's sale following a nonjudicial foreclosure.  The developer, plaintiff and appellant Citrus El Dorado, LLC (Citrus), sued several parties, including defendants and respondents FNBN-Rescon I, LLC (Rescon) and Stearns Bank (Stearns).  Documents recorded in the nonjudicial

1

foreclosure proceedings identify Rescon as the present beneficiary of the deed of trust and Stearns as Rescon's "exclusive servicing agent."[1]

In a nonpublished opinion, we held that Citrus had adequately pleaded a cause of action for wrongful foreclosure against Stearns and Rescon, though several other alleged causes of action were properly dismissed on demurrer. (*Citrus El Dorado, LLC v. Stearns Bank* (Apr. 11, 2019, E067610) [nonpub. opn.].) After Citrus presented its case in chief in a bench trial, the trial court granted Stearns and Rescon's motion for judgment on the wrongful foreclosure cause of action. It also denied Citrus's motion for new trial.

Citrus asserts an array of purported errors and asks us to reverse the judgment and remand for new trial. We find no error and affirm the judgment.

## I. BACKGROUND

In 2005, Citrus purchased a 9.25-acre parcel in La Quinta, California to develop a residential housing tract. In 2007, Citrus entered into a "Construction Loan Agreement" with First Heritage Bank, N.A. (First Heritage) to fund the construction's first phase, which consisted of ten completed houses, including three models, and 19 finished lots. First Heritage was to disburse to Citrus a total of $13,394,000, including $6,450,000 at closing to refinance Citrus's preexisting debt secured by the property, and the remainder

---

[1] Stearns and Rescon are related entities. As noted in a federal appellate opinion arising from related litigation, the Federal Deposit Insurance Corporation (FDIC) "created Rescon, and assigned its interest [in Citrus's loan] to it." (*FNBN RESCON I, LLC v. Citrus El Dorado, LLC* (9th Cir. 2018) 725 Fed. Appx. 448, 450.) In a separate, contemporaneous transaction, a subsidiary of Stearns "purchased the FDIC's sole membership interest in Rescon . . . ." (*Ibid.*) Stearns also "agreed to service the loan on Rescon's behalf." (*Ibid.*)

in a series of incremental draws during construction. The loan was secured by a deed of trust on the property.

After Citrus received some of the loan funds, First Heritage failed and the FDIC was appointed as its receiver in July 2008. First National Bank of Nevada, which participated in the loan with First Heritage, also failed and was placed into FDIC receivership.[2] The FDIC, as receiver for First Heritage, funded several more draw requests by Citrus. The terms of Citrus's loan provided for a maturity date of October 16, 2008, when the loan had to be fully repaid, with interest. The FDIC and Citrus agreed, however, to extend the maturity date to April 16, 2009.

In February 2009, the FDIC notified Citrus that its loan had been assigned to "a new lender" and that payments on the loan should be made to Stearns. When Stearns began servicing the loan, there was a balance of undisbursed loan funds of over $609,000.[3] But when Citrus submitted a draw request for $169,856.01 in March 2009, Sterns declined to fund it.

_____

[2] In this context, to participate in a loan means to purchase an interest in the loan. (See, e.g., *Southern Pacific Thrift & Loan Assn. v. Savings Assn. Mortgage Co.* (1999) 70 Cal.App.4th 634, 637 [describing loan participation agreement].) Here, First Heritage was the originator of the loan and lead lender. Initially, First National Bank of Arizona was the participant lender. First National Bank of Nevada acquired that participating interest by merger with First National Bank of Arizona, before First National Bank of Nevada in turn failed and was placed into FDIC receivership.

[3] Invoices sent by Stearns show over $12.7 million was disbursed, yielding a remainder of about $609,000. Citrus has disputed those invoices. The trial court, however, found in favor of Stearns and Rescon as to how much Citrus owed, as well as on the adequacy of Stearns' accounting showing how those amounts were calculated.

On April 27, 2009, Stearns sent Citrus a "Notice of Event of Default and Demand for Immediate Payment." The notice stated that the loan had "matured on April 16, 2009" and that required payments had not been made, constituting an "immediate Event of Default with no rights to cure . . . ." The notice gave Citrus several weeks to remit the "total payoff balance" of over $13 million, including a principal balance of over $12.7 million. Citrus made no payment in response.

In July 2009, defendant Chicago Title Company (Chicago Title) recorded a "Substitution of Trustee," substituting Chicago Title as the new trustee under the deed of trust.[4] The document identified Rescon as the "present Beneficiary" of the deed of trust, and showed that it was executed by Stearns as Rescon's "exclusive servicing agent." On the same date, Chicago Title recorded a "Notice of Default and Election to Sell," also executed by Stearns as Rescon's "exclusive servicing agent." Nevertheless, no foreclosure was completed then. Instead, the parties engaged in years of litigation, mostly in federal court.[5]

With that litigation ongoing, in November 2014, Chicago Title recorded a new "Notice of Default and Election to Sell." According to this document, there was a total balance due of over $20 million as of October 23, 2014. In February 2015, Chicago Title

---

[4] The trial court sustained Chicago Title's demurrer to the claims Citrus asserted against it in this action, and we affirmed that ruling. (See *Citrus El Dorado, LLC v. Chicago Title Co.* (2019) 32 Cal.App.5th 943, 952.)

[5] This litigation is described in more detail in our earlier opinion. (See *Citrus El Dorado, LLC v. Stearns Bank, N.A.*, *supra*, E067610.)

issued a "Notice of Trustee's Sale," stating that the property would be sold at public auction. The federal district court declined to stay the foreclosure sale. A "Trustee's Deed Upon Sale," recorded March 6, 2015, indicates that the public auction took place on March 5, 2015, and that Rescon was the highest bidder with a credit bid of $7.2 million.[6]

The federal district court rejected Citrus's efforts to add claims arising from the foreclosure sale to its litigation. That case culminated in a jury verdict in favor of Citrus on its breach of contract claim against Stearns (but not Rescon), awarding Citrus damages of $1.2 million. (See *FNBN Rescon I, LLC v. Citrus El Dorado, LLC*, *supra*, 725 Fed. Appx. at p. 450.) That award was affirmed on appeal. (*Id.* at p. 453.) The same jury found against Rescon on its claims against several guarantors of Citrus's loans, finding Rescon had "acted in bad faith and was therefore precluded from recovering on the guaranty."[7] (*FNBN Rescon I, LLC v. Citrus El Dorado, LLC*, *supra*, at p. 451.) That finding, too, was affirmed on appeal. (*Id.* at p. 453.)

Citrus filed this lawsuit in March 2016. We held that the trial court properly dismissed on demurrer several of Citrus's alleged causes of action, but Citrus had

---

[6] At a nonjudicial foreclosure sale, the lender "is entitled to make a credit bid up to the amount of the outstanding indebtedness." (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1238.) "The purpose of this entitlement is to avoid the inefficiency of requiring the lender to tender cash which would only be immediately returned to it." (*Ibid.*)

[7] The guarantors included Scott Shaddix, the managing member of Citrus, as well as Craftsmen Homes, LLC, and Sweetwater Holdings, Inc. (*FNBN Rescon I, LLC v. Citrus El Dorado, LLC*, *supra*, 725 Fed. Appx. at p. 450.)

adequately pleaded a cause of action for wrongful foreclosure. (*Citrus El Dorado, LLC v. Stearns Bank*, *supra*, E067610.)

After Citrus presented its case in chief in a bench trial on its wrongful foreclosure claim, Stearns and Rescon moved for judgment. (See Code Civ. Proc., § 631.8, subd. (a).) The trial court tentatively indicated it would grant the motion, but it allowed Citrus to file a written opposition and make an offer of proof. (*Ibid.*) The trial court was not persuaded by Citrus's opposition and offer of proof, so it granted the motion for judgment. It explained its ruling in a statement of opinion proposed by Stearns and Rescon and adopted over Citrus's objections. The trial court also denied Citrus's motion for new trial.

## II. DISCUSSION

Citrus contends that Stearns and Rescon's motion for judgment should have been denied and asks that we reverse and remand for a new trial. We are not persuaded.[8]

### A. Applicable Law

The "basic elements" of a wrongful foreclosure cause of action are: "'(1) the trustee or mortgagee caused an illegal, fraudulent, or willfully oppressive sale of real property pursuant to a power of sale in a mortgage or deed of trust; (2) the party attacking the sale (usually but not always the trustor or mortgagor) was prejudiced or harmed; and

---

[8] Stearns and Rescon argue that Citrus "forfeited its appeal by not fairly summarizing the evidence, and by failing to attempt to demonstrate error under the applicable standard of review." We disagree with that sweeping claim, but, as specifically noted, however, we find some arguments forfeited.

(3) in cases where the trustor or mortgagor challenges the sale, the trustor or mortgagor tendered the amount of the secured indebtedness or was excused from tendering.'" (*Miles v. Deutsche Bank National Trust Co.* (2015) 236 Cal.App.4th 394, 408 (*Miles*).) "Recognized exceptions to the tender rule include when: (1) the underlying debt is void, (2) the foreclosure sale or trustee's deed is void on its face, (3) a counterclaim offsets the amount due, (4) specific circumstances make it inequitable to enforce the debt against the party challenging the sale, or (5) the foreclosure sale has not yet occurred."  (*Chavez v. Indymac Mortgage Services* (2013) 219 Cal.App.4th 1052, 1062.)

Under California contract law, "hindrance of the other party's performance operates to excuse that party's nonperformance."  (*Erich v. Granoff* (1980) 109 Cal.App.3d 920, 930; see Civ. Code, § 1511 ["The want of performance of an obligation . . . in whole or in part, or any delay therein, is excused by the following causes, to the extent which they operate: [¶] . . . [w]hen such performance . . . is prevented or delayed by the act of the creditor"].)  Whether a party caused the delayed performance or nonperformance of the other is a question of fact, to be decided by the finder of fact.  (See *Semas v. Bergmann* (1960) 178 Cal.App.2d 758, 762 [stating that a "promisor's delay in performance is excused to the extent acts of the promisee caused such delay" and reviewing causation findings for substantial evidence].)

"The standard of review of a judgment and its underlying findings entered pursuant to [Code of Civil Procedure] section 631.8 is the same as a judgment granted after a trial in which evidence was produced by both sides."  (*San Diego Metro. Transit*

7

*Dev. Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517, 528.) "In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) In many cases, we review findings of fact for substantial evidence. (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 501.) But when a party challenges on appeal a ruling that it failed to carry a burden of proof, the substantial evidence standard is inappropriate, and "'the question . . . becomes whether the evidence compels a finding in favor of the appellant as a matter of law.'" (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465-466 (*Sonic*).) Specifically, the question becomes whether the appellant's evidence was (1) "'"uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*Ibid.*)

**B. Analysis**

The trial court found that Citrus had proved none of the elements of a wrongful foreclosure cause of action. Citrus asserts that the evidence compels the opposite conclusion. We find that Citrus is incorrect, focusing our discussion on Citrus's arguments on the first element, whether the foreclosure sale was "'illegal, fraudulent, or willfully oppressive.'" (*Miles*, *supra*, 236 Cal.App.4th at p. 408.)

1. *Stated Redemption Amount*

Citrus asserts that the "redemption figure" stated in the 2014 default notice—about $20.2 million—was "wrongfully inflated." Citrus contends that amount, based on a

principal balance of over $12.7 million, is wrong because "[t]he evidence only shows approximately $8.7 million in loan proceeds, not $12.7 million."

The evidence Citrus cites, however, accounts for only disbursements made directly to Citrus. It does not account for disbursements made from loan funds directly to vendors or government tax agencies that did not pass through Citrus accounts. The trial court reasonably decided that the evidence, viewed in that context, does not compel the conclusion Citrus would prefer.

Moreover, there is no reason why the trial court should have ignored other record evidence that, particularly when viewed in the light most favorable to the judgment, affirmatively supports its conclusions about principal balance and total redemption amount. Such evidence includes contemporary account statements, audits, and other records from Stearns and, earlier, the FDIC. It also includes numbers used and

statements made by Citrus itself, including in its final draw request,[9] in a 2009 "Presentation of Claim" against the FDIC,[10] and in correspondence with Stearns.[11]

Thus, Citrus's contention that the redemption amount stated in the default notice was inflated is not supported by uncontradicted and unimpeached evidence, as would be required to disturb the trial court's findings.[12] (See *Sonic*, *supra*, 196 Cal.App.4th at pp. 465-466.) Citrus has not demonstrated the default notices were "illegal" or "fraudulent,"

---

[9] Citrus stated that the undisbursed funds "before this draw" totaled "$609,290", applied for payment of $169,856.01, and certified that the balance remaining unfunded as a result would be $439,433.61. Given an initial total of funds available under the loan of $13,394,000, it follows that $12,784,710.38 in loan funds had been previously disbursed, exactly the amount stated in the default notice.

[10] Citrus stated that when First Heritage failed, "there was $2,358,863.36 in funds available" for disbursement under the loan agreement, which correlates to a principal balance at the time of over $11 million even before later distributions by the FDIC.

[11] In correspondence with Stearns in April 2009 related to Citrus's final draw request, Citrus commented that in Stearns's records of the loan, received from the FDIC, "[t]he total funded is correct," though "the payees are not."

[12] Citrus asserts that its "2012 judgment against Rescon affected the amount of interest that could be included in the notices, making the notices defective." This passing assertion is not developed with reasoned argument, let alone citation to legal authority and evidence in the record. Similarly, elsewhere in its briefing, Citrus states that the "$20+ million redemption figures in the notices also resulted from gross miscalculations of interest and fees." Again, however, the statement is made in passing, without citation to evidence or authority, and without explanation of the reasoning underlying it. We decline to develop these arguments for Citrus and deem them forfeited. (See Cal. Rules of Court, rule 8.204(a)(1)(B) [appellate briefs must ["[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority"; *Heavenly Valley v. El Dorado County Bd. of Equalization* (2000) 84 Cal.App.4th 1323, 1345, fn. 17 ["[W]e need not address contentions not properly briefed"].)

or that the foreclosure was wrongful in any other way because of an inflated redemption amount.

2. *Itemization of Amounts Owed*

Citrus argues that the foreclosure was wrongful because Citrus "received no proper response" to its demands for an accounting. The operative word here is "proper," as there is no dispute that Citrus received responses to its 2009 and 2013 requests for an accounting. Citrus just does not view the responses it received as adequate. For the reasons below, we do.

During the nonjudicial foreclosure process, "'the debtor/trustor is given several opportunities to cure the default and avoid the loss of the property.'" (*Turner v. Seterus, Inc.* (2018) 27 Cal.App.5th 516, 527; Civ. Code, § 2924c, subd. (a)(1).) Generally, the debtor "may either reinstate, or cure, the loan by bringing [its] payments current no later than five business days before the scheduled sale [citations], or [it] may redeem, or pay off, the loan by paying off the entire amount owed before the sale occurs [citations]." (*Crossroads Investors, L.P. v. Federal National Mortgage Assn.* (2017) 13 Cal.App.5th 757, 777-778.) By statute, the recorded notice of default must inform the debtor that "[u]pon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay," and must include an address and phone number to contact "[t]o find out the amount you must pay, or to arrange for payment to stop the foreclosure . . . ." (Civ. Code, § 2924c, subd. (b)(1).)

Here, as of the April 16, 2009, extended maturity date of Citrus's loan, the entire amount owed was due, so making up late payments was not an option. Citrus twice requested in writing an accounting, and twice received a response. These responses, delivered within weeks after each request, stated the total payoff balance as of a particular date, with the total broken out into principal, interest, and several categories of fees and costs. The responses were more than adequate to inform Citrus of the total amount needed to stop the foreclosure and provided some information about how the amount was calculated. In our view, that is all that Civil Code section 2924c requires.

Citrus interprets "written itemization of the entire amount you must pay" (Civ. Code, § 2924c, subd. (b)(1)) to mean something like a complete accounting of each individual disbursement, interest charge, fee, and so on, rather than a summary consisting of "lump sum" amounts. Citrus cites no authority in support of this reading of the statutory language, however, and we are aware of none. The "written itemization" provision is intended to give the borrower updated information about the amount needed to reinstate or redeem the loan, which may properly include certain amounts beyond what is stated in the notice of default. (See Civil Code, § 2924c, subds. (a), (b)(1); *Anderson v. Heart Fed. Sav. & Loan Assn.* (1989) 208 Cal.App.3d 202, 217 (*Anderson*) [upon request, the beneficiary or mortgagee must "inform [borrower] correctly about the amounts 'then due' on the obligations properly noticed in the notice of default and the foreclosure costs"].) That information allows the borrower "to project the amount presently due and to tender that amount," either to cure the default or redeem the loan,

12

and thus stop the foreclosure. (*Anderson*, *supra*, 208 Cal.App.3d at p. 217.) It is the total amount due, not a breakdown and justification of every portion of the debt, that matters for that limited purpose.

Moreover, even in the absence of *any* response to a written request under Civil Code section 2924c, let alone a purportedly inadequate response, the borrower may reinstate or redeem the loan by tendering payment based on other available information. (See *Crossroads Investors, L.P. v. Federal National Mortgage Assn.*, *supra*, 13 Cal.App.5th 757, 793 (*Crossroads*) ["Crossroads could have reinstated or redeemed the loan by tendering payment based on the information Fannie Mae had provided in the notice of default or the bankruptcy proof of claim"].) Where the parties dispute the appropriate tender amount, the borrower may pay the higher amount "under protest . . . to maintain possession of the property, and then seek to recover the amount it overpaid." (*Ibid.*) In the alternative, the borrower may tender a lower amount, and later satisfy the tender requirement of a wrongful foreclosure claim by proving that the tendered amount was equal to or exceeded the required amount. (See *Anderson*, *supra*, 208 Cal.App.3d at p. 217 [borrower will "prevail on the merits of the issue of sufficiency of the amount of tender" if proven at trial that tendered amount equaled or exceeded amount required to reinstate].) And, if the beneficiary or mortgagee's failure to provide accurate information caused the borrower's tender to be less than the amount needed to cure the default or redeem the loan, the borrower's shortfall will be excused. (*Ibid.*)

No authority supports Citrus's suggestion that *just* a failure to provide an adequate itemization of the redemption amount, without more, may render a foreclosure illegal, fraudulent, or willfully oppressive. Citrus cites *Crossroads*, *supra*, 13 Cal.App.5th 757, 782, for the proposition that "the lender's failure to provide the requested accounting may result in a wrongful foreclosure." In fact, *Crossroads* observes that a beneficiary's failure to provide requested accounts *combined with other circumstances* can create wrongful foreclosure liability. (*Crossroads*, *supra*, 13 Cal.App.5th at p. 782.) In *Crossroads*, those other circumstances included the beneficiary's refusal to accept tenders, a broken promise to give the borrower notice, and the borrower's "many" statements that it "was ready, willing, and able to cure the default or pay off the loan upon being provided the amount necessary to do so." (*Id.* at pp. 769 [quote], 782.)

Our facts are meaningfully different. Unlike the borrower in *Crossroads*, Citrus received payoff amounts several times but never tendered payment or expressed intention to do so, either at the amount stated or at another amount it believed correct.[13] *Crossroads* does not suggest that failure to provide the requested accounting *alone* can demonstrate a foreclosure sale was illegal, fraudulent, or willfully oppressive.

3. *Substitution of Trustee*

Citrus argues that the foreclosure on the property is "void for lack of a proper trustee." In its view, because the recorded "Substitution of Trustee" appointing Chicago

---

[13] Citrus has not argued that its offers to purchase the loan at discounted amounts were tender offers. Correctly so. (See *Crossroads*, *supra*, 13 Cal.App.5th at p. 789 [for a tender to be valid it "'must be of full performance'" and "'unconditional'"].)

14

Title as the new trustee under the deed of trust was signed by Stearns in its capacity as "exclusive servicing agent," rather than directly by the beneficiary of the deed of trust, it is void. It is a close question whether this argument is simply without merit or whether it is also frivolous. (See *Kalnoki v. First American Trustee Servicing Solutions, LLC* (2017) 8 Cal.App.5th 23, 40 [an agent on behalf of beneficiary may execute substitution of trustee]; *Dimock v. Emerald Properties* (2000) 81 Cal.App.4th 868, 872 [same].) Either way, it does not warrant extended discussion.

4. *Rescon Authority to Foreclose*

Citrus contends that the foreclosure was unlawful because Rescon lacked the authority to foreclose, proposing several reasons it believes that to be so. We find Citrus has not demonstrated that Rescon lacked authority to foreclose.

First, Citrus argues that, under the terms of its loan and California law, the FDIC and Rescon "needed Citrus's consent for an assignment." It is undisputed that Rescon and the FDIC did not seek or receive such consent. Citrus concludes on that basis that "the alleged assignment to Rescon is void for lack of written consent from Citrus," and thus Rescon had no authority to foreclose. Citrus's conclusion, however, does not follow from its premises.

"Congress has granted the FDIC as receiver express statutory authority to dispose of receivership assets, thereby reducing the losses borne by federal taxpayers when federally insured financial institutions . . . fail." (*Sahni v. American Diversified Partners* (9th Cir. 1996) 83 F.3d 1054, 1058 (*Sahni*).) The FDIC's power to dispose of

15

receivership assets includes the power to "place the insured depository institution in liquidation and proceed to realize upon the assets of the institution . . . ." (12 U.S.C. § 1821, subd. (d)(2)(E).)  It also includes the power to "transfer any asset or liability of the institution in default . . . without any approval, assignment, or consent . . . ." (*Id.*, § 1821, subd. (d)(2)(G)(i)(II).)  Courts may not take "any action . . . to restrain or affect the exercise of powers or functions of the [FDIC] as . . . a receiver." (*Id.*, § 1821, subd. (j).)

"Because Congress specifically exempted the FDIC from having to obtain any consent when effectuating the sale or transfer of receivership assets," state law that would require such consent is "preempted." (*Sahni*, *supra*, 83 F.3d at p. 1059.)  *Sahni* involved a conflict with a California statute regarding "the rights, powers, and liabilities of general partners" on the "issue of consent." (*Id.* at p. 1059.)  The principle also applies, however, to other parts of state law, including contract law.  (See *Volges v. Resolution Trust Corp.* (2d Cir. 1994) 32 F.3d 50, 52 [receivers have broad powers to dispose of the assets of a failed institution as they see fit, even if sale would violate state contract law].)  Thus, the FDIC's assignment of the loan to Rescon without Citrus's consent was "well within its broad statutory powers as receiver" (*Sahni*, at p. 1059) even assuming Citrus is correct that the loan's terms, as interpreted under California contract law, would require Citrus's consent for such an assignment.

The Ninth Circuit's holding in *Bank of Manhattan, N.A. v. FDIC* (9th Cir. 2015) 778 F.3d 1133 (*Bank of Manhattan*) does not require a different conclusion.  *Bank of Manhattan* and similar cases hold that the FDIC may not "breach pre-receivership

16

contracts *without consequence*." (*Id.* at p. 1137 (italics added).) That consequence, however, is only the possibility that the FDIC could be held liable for contract damages. (*Bank of Manhattan*, 778 F.3d at p. 1136 [if "the [receiver] violate[s] pre-receivership contracts rather than repudiate them [federal law] does not afford the [receiver] immunity from subsequent actions for breach of contract"]; see also, e.g., *Ambase Corp. v. U.S.* (Ct. Cl. 2004) 61 Fed.Cl. 794, 799 [federal law "is not directed to the pursuit of money damages *ex post* as the result of FDIC actions."].) Like any contracting party, absent special circumstances not applicable here, the FDIC as receiver may choose "to breach a contract and pay damages . . . instead of being required by law to perform."[14] (*Huynh v. Vu* (2003) 111 Cal.App.4th 1183, 1198; see *Volges, supra*, 32 F.3d at p. 52; 12 U.S.C. § 1821, subd. (d)(2)(J)(ii) [as receiver, FDIC may "take any action authorized by this Act, which the [FDIC] determines is in the best interests of the depository institution, its depositors, or the [FDIC]"].) No authority supports Citrus's view that an action by the FDIC that is within the scope of its power as receiver, but in breach of a pre-receivership contract, is void.

Citrus also raises a hodgepodge of other arguments based on purported defects in the documents showing assignment of the loan to Rescon. The arguments Citrus raises, however, are of the sort routinely rejected in analogous contexts. (See, e.g., *Debrunner v.*

---

[14] The federal district court dismissed the FDIC from its litigation because Citrus had failed to exhaust its administrative remedies. (See *Citrus El Dorado, LLC v. Stearns Bank*, *supra*, E067610.)

*Deutsche Bank National Trust Co.* (2012) 204 Cal.App.4th 433, 440 ["Plaintiff's reliance on the California Uniform Commercial Code provisions pertaining to negotiable instruments is misplaced"]; *Mendoza v. JPMorgan Chase Bank, N.A.* (2016) 6 Cal.App.5th 802, 819-820 [allegation that signature was unauthorized or constituted a fraudulent robo-signature shows at most a voidable transaction, not void]; see also *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 936 ["Unlike a voidable transaction, a void one cannot be ratified or validated by the parties to it even if they so desire"].) We already addressed at least one of the arguments Citrus asserts here, based on the same documents, in our opinion on Citrus's appeal of the dismissal of its claims against Chicago Title. (See *Citrus El Dorado, LLC v. Chicago Title Co.*, *supra*, 32 Cal.App.5th at p. 951 ["We are not persuaded that it was improper for Stearns, rather than Rescon, to sign the notice of default"]; see § 2924, subd. (a)(1) [notice of default may be recorded by trustee, mortgagee, or beneficiary, or any of their authorized agents].) We agree with the trial court that the "evidence and arguments offered by Citrus to support its claims that the assignments by the FDIC of the Note and [deed of trust] to Rescon were void are either inapplicable, misstatements of the law, misstatement of the facts, or establish, at best, only that the assignments may have been voidable but not void," and that in fact "[n]one of the evidence presented by Citrus established a defect in the chain of title from First Heritage to Rescon." We do not find that any of Citrus's arguments in this vein merit further discussion.

5. *Loan Restructuring*

Citrus argues that the foreclosure was "willfully oppressive" because "Stearns stonewalled Citrus and offered no timely restructuring plan" in violation of "the public policy favoring restructuring." This argument conflicts with recent California Supreme Court authority.

In *Sheen v. Wells Fargo Bank, N.A.* (2022) 12 Cal.5th 905, 915 (*Sheen*), the court held that a lender generally does not owe a borrower a duty to modify or even consider modifying the borrower's loan. (*Ibid.*) *Sheen* is an application of the economic loss rule, which provides that there is no recovery in tort for negligently inflicted financial harm unaccompanied by physical or property damage. (*Id.* at p. 922.) *Sheen* quotes with approval language from *Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1096 (*Nymark*), adapting the economic loss rule to the lender-borrower context: a "'financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money.'" (*Sheen*, at p. 927 [citing *Nymark,* at p. 1096]; see also *Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 67 ["[A] loan modification is the renegotiation of loan terms, which falls squarely within the scope of a lending institution's conventional role as a lender of money"].) Thus, Stearns could foreclose on Citrus's property without offering terms for restructuring the loan.

Citrus's reliance on *Majd v. Bank of America* (2015) 243 Cal.App.4th 1293 (*Majd*) for a different conclusion is misplaced. *Majd* held that the plaintiff homeowner could

19

maintain wrongful foreclosure and unlawful business practice claims based on his loan servicer's alleged violation of certain applicable federal regulations and procedures (the "Home Affordable Modification Program" (HAMP)) designed to facilitate loan modifications for homeowners. (*Id.* at pp. 1296, 1300-1304.) The court also noted that the same alleged facts would have implicated California's then-recently adopted Homeowner Bill of Rights (HBOR), had it been in effect before the plaintiff's foreclosure. (*Majd*, at p. 1303; see *Morris v. JPMorgan Chase Bank, N.A.* (2022) 78 Cal.App.5th 279, 295 (*Morris*) [HBOR is "a complex set of enactments . . . passed as a legislative response to the ongoing mortgage foreclosure crisis in 2012").) On our facts, however, neither HAMP, nor HBOR, nor any other similar set of statutory or regulatory provisions applies to require modification of Citrus's loan, or that modification be considered before foreclosure. (C.f. *Majd*, at p. 1301 [threshold eligibility requirements for HAMP loan modification include that loan be secured by borrower's primary residence]; *Morris*, at p. 295 [HBOR is "focused specifically on residential mortgages"]; see also, e.g., Civ. Code, § 2920.5, subd. (c)(1) [defining "'borrower'" to mean "any natural person who is a mortgagor or trustor" potentially eligible for certain loan modification programs]; *id.*, § 2924.15, subds. (a)(1)(A), (2)(A) [limiting specified provisions to loans secured by principal residence of either owner or tenant of owner].) The rule applicable to Citrus's loan is the one articulated in *Sheen*, not *Majd*.

6. *One Action Rule*

As part of the earlier litigation between the parties, in 2009, Rescon filed a cross-complaint against Citrus asserting two causes of action: (1) for judicial foreclosure, and (2) for specific performance, appointment of a receiver, and an injunction. Citrus argues that this cross-complaint triggered California's one action rule, codified in Code of Civil Procedure section 726, subdivision (a), and "disabled Rescon from being able to foreclose." Citrus is incorrect.

In relevant part, Code of Civil Procedure section 726 provides "(a) There can be but one form of action for the recovery of any debt or the enforcement of any right secured by mortgage upon real property." This "one action rule" generally "compels a secured creditor to exhaust its security in a single judicial action before obtaining a monetary deficiency judgment against the debtor." (*C.J.A. Corp. v. Trans-Action Financial Corp.* (2001) 86 Cal.App.4th 664, 668.) "The purpose of the one action rule is to prevent a secured creditor from enforcing its rights by seeking recourse to more than one remedy, such as by obtaining both a money judgment on the mortgage debt and by foreclosing on the mortgage." (*Id.* at pp. 668-669.) If a creditor, in violation of the one action rule, "sues on the obligation" without pursuing foreclosure on the security, the creditor made "an election of remedies, electing the single remedy of a personal action, and thereby waives his right to foreclose on the security or to sell the security under a power of sale." (*Walker v. Community Bank* (1974) 10 Cal.3d 729, 733.) "[A] creditor

21

who uses his 'one action' is thereafter barred even from nonjudicial foreclosure." (*Aplanalp v. Forte* (1990) 225 Cal.App.3d 609, 614 (*Aplanalp*).)

In its 2009 cross-complaint, Rescon did exactly what the single action rule requires by seeking a monetary judgment *as part of* its cause of action for judicial foreclosure. Rescon sought "a judicial decree of foreclosure under the Deed of Trust, to direct the sale of the Property encumbered by the deed of trust, to declare the amount of indebtedness due [Rescon] and to determine the personal liability of Borrower . . . for any deficiency remaining thereafter, and enter judgment accordingly." Its prayer for damages separated out the remedies it sought by cause of action, and included a request for a money judgment on only the first cause of action for judicial foreclosure, specifying that proceeds of the foreclosure sale should be applied to the amount due under the judgment.

Importantly, the mere commencement of a lawsuit, even if in violation of the one action rule, does not waive the creditor's right to later foreclose on the security or to sell the security under a power of sale. (See *Shin v. Superior Court* (1994) 26 Cal.App.4th 542, 547 ["'the mere *commencement* of an action by the creditor that does not include a foreclosure of all the real property security is not in violation of the rule since the creditor may dismiss the action before judgment or amend the complaint to include a foreclosure of all of the security'"], quoting 4 Miller & Starr, Cal. Real Estate (2d ed. 1989) Deeds of Trust and Mortgages, § 9:105, p. 348, italics in original & fns. omitted.) Rescon's judicial foreclosure cause of action was dismissed without prejudice before trial by

22

stipulation of the parties. Thus, the 2009 cross-complaint's first cause of action does not count as Rescon's one action.

Rescon's second cause of action in the 2009 cross-complaint, seeking specific performance, appointment of a receiver for the property, and issuance of an injunction, also did not trigger the one action rule. By statute, the appointment of a receiver under Code of Civil Procedure section 564 does not constitute an action within the meaning of section 726. (Code Civ. Proc., § 564, subd. (d) ["Any action by a secured lender to appoint a receiver pursuant to this section shall not constitute an action within the meaning of subdivision (a) of Section 726"].) Rescon's second cause of action fell squarely within Code of Civil Procedure, section 564, subdivision (b)(11), providing for appointment of a receiver in "an action by a secured lender for specific performance of an assignment of rents provision in a deed of trust, mortgage, or separate assigned document." The second cause of action expressly invoked the assignment of rents provision of the deed of trust, and the corresponding part of the prayer for relief sought appointment of a receiver to take possession of the property with the powers set forth in the assignment of rents provision. On the second cause of action, the prayer for relief also sought injunctive relief, but included no request for a monetary judgment.

In some situations, a receiver's actions taken on behalf of a secured creditor may run afoul of section 726. (See *In re 500 Ygnacio Associates Ltd.* (Bankr. N.D.Cal. 1992) 141 B.R. 191, 194-195 [receiver applied proceeds taken from rents and profits to pay an

indebtedness owed to a secured lender].)  Here, however, no receiver ever was appointed, since the court found for Citrus on that cause of action.

In sum, Rescon's 2009 cross complaint complied with the one action rule by seeking a monetary judgment only as part of a cause of action for judicial foreclosure. That cause of action did not count as Rescon's one action because it was dismissed before trial.  The cross complaint's second cause of action proceeded to trial, but did not seek a monetary judgment.  It sought only specific performance of the deed of trust's assignment of rents provision, appointment of a receiver, and injunctive relief, none of which triggers the one action rule.  Thus, Rescon did not use its one action on the 2009 cross complaint.  The 2015 nonjudicial foreclosure was not barred by the one action rule.

Citrus's analogy to *Aplanalp*, *supra*, 225 Cal.App.3d 609, is inapt.  In *Aplanalp*, the plaintiff borrowers obtained a tort judgment against the defendant creditors.  (*Id.* at p. 612.)  The defendants satisfied that judgment by obtaining a court ruling setting off the tort judgment against payments the plaintiffs owed them on a secured debt.  (*Ibid.*) *Aplanalp* held that the defendants' exercise of their right of equitable setoff was an action within the meaning of the one action rule, so subsequent nonjudicial foreclosure proceedings were improper.  (*Id.* at pp. 614-615.)  This case is different.  Citrus has not argued that Stearns sought to satisfy the tort judgment Citrus obtained against it through an equitable setoff.  Indeed, the appeal of that judgment was not final until years after the 2015 trustee's sale.  (See *FNBN Rescon I, LLC v. Citrus El Dorado, LLC*, *supra*, 725 Fed. Appx. at p. 448 [filed Feb. 1, 2018].)  Instead, Citrus's arguments about the one

24

action rule focus entirely on Rescon's 2009 cross complaint. For the reasons above, those arguments are unpersuasive.

7. *Failure to Fund Draw Request*

Citrus proposes that the foreclosure was willfully oppressive because "Stearns forced the Citrus loan into foreclosure" by refusing to fund Citrus's final draw request, causing the project to "grind[] to a halt." The trial court found that the project did not in fact run aground because of Stearns's failure to fund a draw request, but for various other reasons, for which Stearns and Rescon bore no responsibility.[15] We cannot find that the trial court's findings lacked the support of substantial evidence.

Our earlier opinion found that Citrus had adequately alleged facts from which it could be inferred that Stearns and/or Rescon prevented Citrus from completing the development by failing to fund Citrus's final draw request. (*Citrus El Dorado, LLC v. Stearns Bank, N.A., supra*, E067610.) That failure, Citrus plausibly alleged, caused Citrus to be unable to complete the development and receive the revenue from sales to consumers that was needed to stave off default on the loan. (*Ibid.*)

The trial court found, however, that the evidence did not support Citrus's allegations. Instead, it found the evidence established a number of intervening causes, not the responsibility of Stearns or Rescon, that caused Citrus's default, including: (1) even the entire unfunded balance of loan funds would have been insufficient to complete

---

[15] It is irrelevant for our purposes that the trial court made these factual findings in discussing whether Citrus was excused from tendering payment of the loan, rather than whether the foreclosure was willfully oppressive.

construction of the first phase of the development, let alone the lesser amount requested in the unfunded draw request; (2) even if the remaining funds had been sufficient and promptly provided upon request, there was insufficient time remaining at that point to complete construction of the phase one houses, obtain the permissions required before placing them on the market, and then sell them before the loan matured; (3) even if the phase one houses could have been completed and sold in time, their sale could not have generated enough revenue to pay back even the principal amount borrowed, especially but not only because of the poor housing market in the wake of the 2008 financial crisis; and (4) Citrus "never intended to repay the note upon its maturity—intending instead to negotiate extended financing." Citrus has not argued that any of these findings lack the support of substantial evidence, and our review of the record confirms that such an argument would be unavailing. Given such evidence, the trial court had ample basis to conclude that the failure to fund Citrus's final draw request was not *a* cause, let alone *the* cause of Citrus's default.

In support of a different conclusion, Citrus asserts that the record compels the conclusion that the failure to fund the draw request caused Citrus to suspend construction at the project in March 2009 because it could not pay its contractors. Even if this is true, however, it does not establish that Citrus's default was caused by the failure to fund the draw request. The trial court's factual findings, grounded in substantial evidence, support its conclusion that default on the loan payments was already inevitable by that point, even if Citrus's draw request had been funded.

26

Although its facts are somewhat different, the reasoning of *Jacobs v. Tenneco West, Inc.* (1986) 186 Cal.App.3d 1413 (*Jacobs*) is instructive. That case involved contracts that included a condition requiring approval by the defendant company's board of directors. (*Id.* at p. 1415.) The company failed to submit the contracts to its board for approval or disapproval. (*Id.* at p. 1416.) The consequence of that breach was waiver of the condition of board approval *unless* the company could "prove that the breach did not contribute materially to the nonoccurrence of the condition by showing that the board of directors would not have approved the contracts even had they been submitted to the board in a timely manner." (*Id.* at p. 1417.) Analogously, Citrus plausibly pleaded that Stearns and Rescon essentially forfeited their right to foreclose on the property because their failure to approve Citrus's last draw request caused Citrus's default. Stearns and Rescon could avoid that consequence of their breach by demonstrating that, as a matter of fact, their failure to fund Citrus's draw request, even though wrongful, did not contribute materially to Citrus's default. The trial court found Stearns and Rescon carried that burden of proof, and substantial evidence supported that conclusion.

8. *Federal Jury Finding of Bad Faith*

Citrus suggests that the federal jury's finding that Rescon acted in bad faith as to Citrus's final draw request is "binding here," compelling a finding that "'Rescon' caused an illegal, fraudulent, or willfully oppressive foreclosure." That separate litigation, however, did not involve claims arising from the foreclosure on Citrus's property. And as discussed in the previous section, substantial evidence shows that failure to fund

Citrus's final draw request, which was at issue in that litigation, did not cause the foreclosure. Again, *Jacobs* is instructive. There, the defendant company's bad faith failure to submit the contracts to its board to approve or disapprove—more precisely, a breach of the implied covenant of good faith and fair dealing—did not preclude it from demonstrating that the board, "in the exercise of good faith," would have disapproved the contracts had they been timely submitted for consideration. (*Jacobs*, *supra*, 186 Cal.App.3d at p. 1415.) Here, the wrongful failure to fund Citrus's draw request, even if in bad faith, did not preclude Sterns and Rescon from showing that the foreclosure was not caused by the earlier breach of their obligations, and that the foreclosure was conducted in good faith.

## C. Conclusion

Citrus has not demonstrated that the evidence compels the conclusion that Stearns and Rescon caused an illegal, fraudulent, or willfully oppressive foreclosure, as would be needed to disturb the trial court's determination on the first element of its wrongful foreclosure claim. On that basis alone, the judgment for Stearns and Rescon must be affirmed. We need not and do not address the merits of the parties' arguments on other disputed issues.[16]

---

[16] We reserved for consideration with this appeal a request for judicial notice filed by Citrus on April 14, 2022. The request is denied, as the documents Citrus asks us to notice are either already in our record one way or another, unnecessary to our analysis, or both.

28

## III. DISPOSITION

The judgment is affirmed.  Stearns and Rescon are awarded costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL_____
J.

We concur:

McKINSTER_____
Acting P. J.

MILLER_____
J.